RAMON CARDENAS, APPELLANT, V. PETERSON BEAN CO. ET
AL., APPELLEES.

144 N. W. 2d 154

Filed July 15, 1966.   No. 36257.

Wright, Simmons & Hancock, for appellant.

Lovell & Raymond, for appellees.

Heard before Carter, Spencer, Boslaugh, Brower, Smith, and McCown, JJ., and Colwell, District Judge.

McCown, J.

This is a workmen's compensation case. The district court affirmed an award of the Workmen's Compensation Court sitting en banc granting the plaintiff compensation for an extended period of temporary total disability, medical expense, and for 5 percent permanent partial disability.

The plaintiff, Ramon Cardenas, an employee of Peterson Bean Co., hereinafter referred to as defendant, was injured January 17, 1964, when he fell from a plank walkway while pushing a wheelbarrow into a railroad boxcar. The wheelbarrow was loaded with 100-pound sacks of beans and he fell approximately 6 feet. Some of the sacks of beans also fell down and struck him. As a result of the fall, he received a 2-inch cut on his scalp and also complained of pain around his head, neck, shoulders, chest, and upper back. He was taken to the hospital and remained there under the doctor's care for approximately 5 days. He was released to return to his home, but remained intermittently under the care of Dr. Holmes until June 5, 1964. He had no fractures, but his complaints continued and he was treated with vitamins, liver injections, and decadron, a cortisone-like material useful in the treatment of neuralgia and neuritis, sprains, and strains. On May 14, 1964, Dr. Holmes returned him to the hospital for a revision of the scar on his head. Dr. Holmes last saw him on June 5, 1964. On August 21, 1964, plaintiff went to Dr. Ted E. Riddell for treatment. At that time plaintiff still complained of a pain in his right shoulder and the right side of his neck. Dr. Riddell treated him with steroid injections from time to time, and hospitalized him for traction from October 30 to November 10, 1964. Dr. Riddell also used diathermy and massage which was continued until January 1965, when he did not return to Dr. Riddell. Dr.

Riddell referred him to Dr. Schutzer, a psychiatrist who examined the plaintiff November 9 and 10, 1964, and also on July 8, 1965. Dr. John H. Floyd performed a cervical myelogram on the plaintiff on June 30, 1965, which disclosed no material abnormalities. The plaintiff was examined at one time or another by Dr. Schreiner, Dr. Lawrence M. Robertson, Jr., a neurosurgeon of Denver, Colorado, Dr. L. E. Daniels, a neurologist of Denver, Colorado, and Dr. Chester H. Farrell, a neuropsychiatrist of Omaha, Nebraska. Dr. Schreiner did not testify. A report from Dr. Robertson was introduced in evidence, and all the other doctors mentioned testified. Essentially, the doctors all agreed they could find no physical or organic reason to account for the extent of the complaints and symptoms evidenced by the plaintiff. Dr. Schutzer, however, was of the opinion that the plaintiff was temporarily totally disabled from a traumatic neurosis. He also testified in response to a question as to whether the plaintiff was able to earn wages in the same kind of work or work of a nature similar to that he had been doing by stating: "I would say that he's not able to perform as capably as he did before. I feel the symptom would prevent him from engaging in work in that same way." Dr. Farrell was of the opinion that the plaintiff had an "hysterical fixation upon a traumatical incident." Dr. Farrell felt that the plaintiff was partially incapacitated because of the fact he had a traumatic incident, but did not want to state any percentage that he was disabled. Dr. Robertson was the only physician who ever gave a specific opinion as to a percentage of permanent partial disability and his estimate was 5 percent.

Since the accident, the plaintiff has neither attempted to work nor applied for work. His complaints continue essentially the same except that there are no longer complaints as to his chest. Dr. Farrell probably expressed accurately the concensus of all the doctors on this issue when he stated: "I know this man has fear

that he has been hurt greater than he actually has."

At the initial hearing before a single judge of the Workmen's Compensation Court on January 25, 1965, it was found that the plaintiff was temporarily totally disabled and would remain totally disabled for an indefinite future period. At the hearing before the Workmen's Compensation Court sitting en banc on July 13 and 14, 1965, the plaintiff was awarded compensation of $37.50 per week for temporary total disability for a period of 69 2/7 weeks ending May 17, 1965, and, in addition, $1.88 per week for 230 5/7 weeks for a 5 percent permanent loss of earning power. The compensation court specifically found that the plaintiff failed to maintain the burden of proving that he sustained any traumatic neurosis or any disability beyond that awarded. On November 27, 1965, the district court affirmed the award of the compensation court in all respects.

The plaintiff's first group of assignments of error center around the court's finding as to disability and the specifically related problem of traumatic neurosis.

This court is committed to the rule that a workman is entitled to recover compensation for neurosis if it is a proximate result of his injury and results in disability. See Haskett v. National Biscuit Co., 177 Neb. 915, 131 N. W. 2d 597. In that case, however, it was pointed out that there was no serious contention of malingering. In this case, the expert testimony ranges all the way from an opinion that the plaintiff was entirely malingering to one that he was not malingering at all. Psychiatrists concede that conscious actions may be involved to one degree or another, even in admitted cases of traumatic neurosis. The distinction between hysteria, a neurotic illness, and malingering seems to be in whether the patient acts or reacts as he does consciously or unconsciously. Medically speaking, it is extremely difficult to classify an individual as acting wholly consciously or wholly unconsciously. Fortunately or unfortunately, however, the law must attempt the classification. Even

if it be conceded that an individual has a neurosis, however, this does not make the neurosis compensable nor prove his total disability. Except for scheduled member losses, workmen's compensation awards are not made for injury as such, but for inability to perform or obtain work produced by such injury. The degree of disability also depends upon the inability to perform or to obtain work. The extent of the disability is still subject to proof whether the injury is "physical" or "mental." In any event, both the issue of whether or not the plaintiff had a traumatic neurosis and the question of the extent of his disability were questions of fact and the medical evidence supports the award in this case. The rule is also applicable here that where evidence is irreconcilable and in direct conflict, this court will consider that the trial court had the opportunity of observing the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite. See Runyons v. Mavis & Sons, Inc., 177 Neb. 179, 128 N. W. 2d 596.

The plaintiff also assigns error in several instances in which the court struck answers or responses made by the plaintiff to questions from his own counsel on direct examination, where an objection was made by the defendant's counsel on the ground that the answers were not responsive. It is the plaintiff's position that an objection for lack of responsiveness can be made only by the party examining the witness; and that if the answer is proper evidence, the party who is examining the witness has the right to retain it if he chooses to do so, and it cannot be excluded on this objection by the adverse party. We believe the proper rule to be that counsel who is not conducting the questioning has no standing to ask that a nonresponsive answer be stricken upon the sole ground of lack of responsiveness. See, III Wigmore on Evidence (3d Ed.), § 785, pp. 160, 161; United States v. Schneiderman, 106 F. Supp. 892. However, a voluntary statement by a witness, not respon-

sive to a question, should be stricken. 98 C. J. S., Witnesses, § 356, p. 79. Here it is difficult to determine in many instances whether the responses were voluntary statements or were merely irrelevant, unresponsive answers. The testimony of the plaintiff was being taken through an interpreter. In some instances, the plaintiff continued speaking in Spanish after the question had been answered and the interpreter was interpreting. In some instances, the plaintiff gave direct answers or additional comments in English. The plaintiff was unschooled as well as emotional and the entire circumstances created a difficult situation for both counsel and the court.

The objections of defendant's counsel, while in one or two instances they disclosed that they were based on the voluntary nature of the statements, in most instances were only on the grounds that the answer was not responsive. Ordinarily, of course, a reason for an objection not given will not be considered where it is not stated. In some instances the court did erroneously sustain objections on the ground of lack of responsiveness. The plaintiff, however, concedes that no single specific instance in which this error was made can be shown to be prejudicial, but argues that the cumulative effect was sufficient to deprive the plaintiff of a fair trial. Under all the circumstances, the errors were not prejudicial, nor did they prevent the plaintiff from having a fair hearing.

The plaintiff next asserts as error the court's failure to strike the testimony of three witnesses, Aurora Amaya, Francisco Amaya, and Raymond Varrza. On April 17, 1965, the plaintiff served an interrogatory upon the defendant asking the names and addresses of all persons who, to the knowledge of the defendant, had witnessed any fact as to the accident, and the preaccident and postaccident physical or mental condition of the plaintiff. No objections or motions were directed at the form or meaning of the interrogatories. On May 8, 1965, the defendant answered the interrogatory that it had no

information as to the names of any witnesses. The three witnesses named were called by the defendant at the trial and testified as to certain conversations had with the plaintiff, and also as to certain occasions after the accident when they saw the plaintiff perform certain physical acts or movements.

No objection whatever was made by the plaintiff at the time each of the three individuals testified. Plaintiff's counsel cross-examined Raymond Varrza and Aurora Amaya extensively but did not cross-examine Francisco Amaya. At the conclusion of the case, after the plaintiff's rebuttal evidence was in, one of plaintiff's counsel inquired of defendant's counsel as to the date that Mr. Varrza and Mrs. Amaya first came to his office, and he gave dates in early February. Counsel then, for the first time, moved to strike all the testimony of Mrs. Aurora Amaya and Mr. Varrza on the ground that their names had not been disclosed in the answer to the written interrogatories. It was also admitted that defendant's counsel had informed plaintiff's counsel by telephone after the date of the answer to the interrogatories that defendant might use Aurora Amaya as a witness, but it is denied that he mentioned Francisco Amaya or Raymond Varrza.

The plaintiff urges that the court's action in refusing to strike the testimony of these witnesses under the above factual circumstances was prejudicial error, and that the penalty for failure to answer the interrogatories properly and truthfully should be the exclusion of the testimony of any such witnesses. Our statute, section 25-1267.37, R. R. S. 1943, covering discovery procedures, does not cover this issue, nor has it been directly passed upon by this court.

Trial courts have broad discretion in the general conduct of a trial, including sanctions involving discovery procedures. See Caves v. Barnes, 178 Neb. 103, 132 N. W. 2d 310. The trial court has discretionary power to exclude the testimony of a witness whose identity is

deliberately withheld in discovery under proper circumstances. The trial court would also have discretion to impose an alternative sanction to effectively protect against harm due to lack of prior knowledge of the witness, such as continuing the hearing or deferring the questioning of such a witness. The object of the rule requiring the disclosure of the names of witnesses before trial is to enable the parties to discover the truth and eliminate surprise, and, dependent on the facts, the overall policy of discovering all the truth, in some circumstances, might be more adequately served by permitting testimony after postponement until the element of surprise has been eliminated. These matters, however, are primarily within the broad discretion of the trial court.

Ordinarily an objection must be made as soon as the applicability of it is known, or could reasonably have been known to the opponent. Objection to a witness' disqualification should ordinarily be made as soon as he is called to the stand, providing his disqualification is then known. See I Wigmore on Evidence (3d Ed.), § 18, p. 323. We see no reason why the same general rules should not apply to the introduction of testimony of a witness whose name has not been properly disclosed in answer to an interrogatory.

While we in no sense attempt to explain the failure of counsel to disclose the names of the witnesses, it is still incumbent upon opposing counsel to make objection promptly. We point out first that no objection was ever made as to Francisco Amaya. Counsel should not be permitted to withhold objection, proceed with full and extensive cross-examination, and then decide whether or not the testimony was prejudicial. Any other position would be contrary to our general rules of evidence and procedure.

In this case, it is contended that plaintiff did not know until inquiry was specifically made of defendant's counsel at the close of the trial that the names of these wit-

nesses were known to the defendant prior to the date of the interrogatories. However, the very first question asked of Aurora Amaya on cross-examination was to determine when she first went to the office of defendant's counsel with the information. If the interrogatories were as broad as the plaintiff seems to interpret them, the introduction at the trial of a witness whose name had not been disclosed might, in itself, reasonably put counsel to a duty of inquiring immediately as to whether actual grounds of objection existed. Under the circumstances here, no error was committed.

For the reasons stated, the judgment of the trial court was correct and is affirmed.

AFFIRMED.

CARTER, J., concurring in the result.

The opinion of the majority is deficient in not dealing with the contention that plaintiff is a malingerer. The evidence shows that plaintiff was first employed by the defendant on January 16, 1964, and suffered the injury for which compensation is sought the next day.

On the first day of the trial plaintiff was asked to raise his right arm and he was able to lift it to a horizontal position. The second day of the trial in response to a similar question he stated: "I have said always that I can not raise my right arm." Dr. L. E. Daniels testified that from his examination he found that plaintiff was malingering. Dr. Ted E. Riddell wrote to plaintiff's attorney on October 30, 1964, that plaintiff came to his office on that day and "put on quite an act." Plaintiff testified that Dr. Riddell told him at one time that he was "playing sick." Dr. Riddell denies making such a statement. Dr. Riddell also testified: "Well, he always seemed a little stiffer when he was in the office than when he was outside." Dr. Ulysses Schutzer testified: "* * * but I am reasonably certain that there must be an element of that particular feature which we have described as malingering or exploiting."

Aurora Amaya testified to taking plaintiff home from

the first hearing before the compensation court and plaintiff then said: "He said that he was not sick, he said he was just going to get money out of the company because the company had a lot of money and he wants to give money and everything to his family, you know, because that is the only way that he was—that he can give his family everything that they need." In 1963, plaintiff told his son-in-law in the course of a conversation: "Well, the subject came about me, that I worked everyday and this time of the year I put in 15, 16 hours a day, so he said that he wasn't figuring on working any more, if he could pull some kind of a stunt or trick where he could get enough so he wouldn't have to work for a while." There was evidence by persons who observed him driving his truck and that he was able to and did move his arms and head in a normal manner, which was inconsistent with his testimony.

Plaintiff, at the time of the accident, was pushing a wheelbarrow loaded with six 100-pound sacks of beans into a boxcar. He fell from the plank between the platform and the boxcar a distance of 6 feet. He struck his head, causing a 2-inch gash, and three sacks of beans fell on his neck and head. He suffered no broken bones and asserts only that he has pain in the back of his neck and some injury to his right arm.

This evidence when considered together indicates rather plainly that plaintiff was contemplating an injury for mercenary purposes; that he obtained employment with defendant and had his accident the very next day; and that he told Aurora Amaya that he was not ill but was only after money. This evidence, plus the evidence of the doctors herein recited, shows rather conclusively that plaintiff's claim was fraudulent.

This evidence is excused by the court's opinion on the ground of plaintiff's ignorance and inability to perpetrate such a scheme. That the plaintiff was ignorant cannot be doubted as no intelligent person would

brazenly announce the purpose of his scheme both before and after the accident. I submit that a physician in giving an expert opinion under such circumstances should not assume that his patient was honest and should confine his evidence to physical abnormalities of which there were none other than the 2-inch gash on the head. In my opinion the plaintiff was suffering from a mind bent on fraud and not from a traumatic neurosis.

I submit that fraud and evil intent are hidden in the recesses of the mind and are very difficult of ascertainment, but where, as here, the evidence shows such an intent before and after the accident, plus supporting findings by three physicians, the employer is entitled to protection against such unconscionable conduct.

The district court affirmed an award for a period of temporary total disability, medical expenses, and for 5 percent permanent partial disability. Plaintiff appealed. Defendant did not cross-appeal and in effect asks for an affirmance. Under the state of the record before us, the result is correct. It is my view that the affirmance should rest on a finding of fraud and the malingering of the plaintiff rather than the unsatisfactory and conflicting evidence of the medical experts. Whether or not the plaintiff was a malingerer or the victim of neurosis involves the determination of his mental state by fine line of demarcation. The evidence of disabling neurosis is very conflicting and the evidence that it was the result of the specific accident is even more so. As I view the record, the claim is fraudulent and the plaintiff a malingerer. The primary basis of the affirmance should rest on these grounds.

BROWER, J., joins in the concurring opinion.