DONALD BLOOMQUIST, JR., APPELLANT, V. CONAGRA, INC., A NEBRASKA CORPORATION, DOING BUSINESS AS NORTHERN STATES BEEF, ET AL., APPELLEES.

481 N.W.2d 156

Filed March 6, 1992.  No. S-89-195.

G. Michael Fenner, and Peter J. Hoagland and Stephen L. Gerdes for appellant.

John F. Thomas and Keith Larsen, of McGrath, North, Mullin & Kratz, P.C., for appellee ConAgra.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Plaintiff-appellant, Donald Bloomquist, Jr., filed his amended petition against defendant-appellee ConAgra, Inc., doing business as Northern States Beef, seeking damages for injuries incurred as a result of defendant's negligence. Plaintiff alleged that he was an employee of Omaha Processors, Inc., and that in the course of his employment he had to go onto defendant's property, where, when he pulled a rope to close an overhead door, a part of the door fell and struck him.

The case was tried to a jury, which returned a verdict for defendant. Plaintiff appealed to this court, where he assigns as error the actions of the trial court (1) in allowing two "surprise" witnesses to testify for defendant, when the identity of the witnesses was not disclosed to plaintiff in response to interrogatories asking for the identity of persons "who have knowledge of any facts relevant to the incident," (2) in refusing to allow the testimony of plaintiff's psychologist, and (3) in permitting defendant's counsel "to point out" certain factors in connection with referrals made by plaintiff's doctor. We affirm, determining that while defendant's counsel acted improperly in presenting the two surprise witnesses without disclosing them to plaintiff, plaintiff did not timely object to that testimony, and the court did not err in permitting the witnesses to testify.

Plaintiff testified that the accident occurred on April 2, 1986, when he was struck on the head by the falling overhead door. There were no witnesses to the accident. Plaintiff had no mark on his head immediately after the accident. At the time, he was

wearing a soft baseball cap, and the door part, weighing between 60 and 100 pounds, allegedly struck him with enough force to cause serious and permanent brain damage. One of his supervisors saw him after the accident, and the supervisor saw no head injuries. Neither the emergency room personnel nor the doctor who examined plaintiff the day of the accident could find any physical evidence that plaintiff had been struck.

On October 3, 1986, plaintiff served interrogatories on defendant. Those interrogatories included: "3. State the names and addresses of each person known to you or your representatives who have knowledge of any facts relevant to the incident or any issues involved in this lawsuit." On November 20, 1986, defendant submitted its answer to the interrogatory, listing four people, in addition to the parties and their attorneys. Dan and Christine Gardner were not listed. On November 29, 1988, 1 week before the trial, defendant submitted amended answers to interrogatories. Those answers included several additional witnesses, but did not include the Gardners. Dan Gardner, the first of the surprise witnesses, testified that he first met with John Thomas, defendant's counsel, 1 to 2 months before the trial, prior to the filing of the amended answers to plaintiff's interrogatories.

The trial began on December 7, 1988. Plaintiff testified that the overhead door fell and struck him, and he testified as to his injuries. He also testified that he had an artificial leg as the result of an automobile accident that had no relation to his later injuries. Plaintiff also testified about a later accident while he was working for Omaha Processors, in which accident he damaged his prosthesis. Defendant's counsel, on cross-examination, questioned plaintiff about Dan Gardner and whether plaintiff had spoken to Gardner after the accident of April 2, 1986. Defendant's counsel also asked plaintiff if he had ever said he "would never be back there to work that day" and if he ever had any conversations about how he "wanted out of work at Omaha Processors and that [he was] going to try to find a way out of working there." Plaintiff denied ever making those statements.

In defendant's case, Dan and Christine Gardner were called as witnesses. The Gardners' testimony contradicted plaintiff's.

Dan Gardner testified that he had had numerous conversations with plaintiff about how they both wanted to get out of their jobs. Gardner also testified that in 1985, plaintiff had injured his prosthesis before coming to work, but successfully lied that it was an on-the-job injury. Gardner testified that plaintiff often discussed faking an injury at work and that plaintiff became so obsessed with planning the injury that Gardner "refused to be his witness."

When asked about the day of the overhead door accident, Gardner testified:

> I saw him for the first time, he was coming through the cooler, and Donnie says — I'm trying to remember exact — Donnie says, that damn door fell over there, I'm saying it hit my head. He tipped his hat (indicating) . . . said he's going home, he said he got hit. I looked, I said, Donnie, where did you get hit? Donnie tipped his hat to me, bent his head. I says, true as true can be, Donnie, there's not a mark, they're never going to believe you. As Donnie walked out the second door, Donnie told me right out of his mouth, let the doctor decide that. I said, Donnie, be sure. I waited all that day scared to death wondering what was happening. I turned around, called Donnie soon after I got off work right that night. Donnie said he's already been to see a doctor and he already seen a lawyer . . . . I said, okay, then, but, Donnie, be very careful, this is not a good case. He says, a no-witness situation is as good as a witness situation. They have no witness and I have no witness.

Christine Gardner testified that she had often overheard her husband and plaintiff discussing the possibility of faking injuries to get out of work.

It is unclear from the record when plaintiff rested after his case in chief, but apparently defendant presented its first two witnesses after plaintiff's case in chief on the afternoon of December 13, 1988. The next morning, defendant continued its case, calling three witnesses, including plaintiff. After the noon recess, plaintiff presented a witness, out of order. This witness was called briefly at 1:15 p.m. and was excused, subject to recall by plaintiff.

Defendant then resumed its case. Dan Gardner and his wife Christine testified as set out above, and Dan Gardner was cross-examined by plaintiff's counsel. Another witness was called by defendant. A recess was taken from 2:45 p.m. to 3:20 p.m., during which time a meeting was held in the judge's chambers. After the recess, defendant's witness continued, and defendant rested.

Plaintiff then recalled his witness mentioned above and concluded her testimony. Plaintiff then called Thomas Rowen, an Omaha attorney who had represented the estate of Christine Gardner's mother in a lawsuit against Blue Cross and Blue Shield Insurance Company. Defendant's counsel objected when plaintiff began to adduce details of the lawsuit. Plaintiff then requested leave to make an offer of proof out of the presence of the jury, and he did so in chambers.

Almost all of Rowen's examination consisted of the offer of proof. Rowen testified that he was the attorney for the estate in a lawsuit against Blue Cross and that John Thomas, who represented defendant in this case, represented Blue Cross in that case. In the case, Christine Gardner was a witness for Blue Cross, testifying against the interests of her father. Her testimony, in essence, was that her parents planned to conceal her mother's preexisting medical condition from the company. Additionally, Rowen testified that the first he knew that Christine Gardner was going to testify in the Blue Cross case was when he checked what witnesses had been subpoenaed and discovered that Christine Gardner had been subpoenaed. Rowen testified that he attempted to talk by telephone to Christine Gardner, but she refused to talk to him. When asked whether he had served interrogatories on Blue Cross requesting the names of all witnesses with knowledge relevant to the issues, Rowen stated, "I'm sure I did."

After plaintiff's offer of proof testimony in chambers, the trial court did not change its ruling on defendant's objection. Plaintiff's counsel then moved to strike the Gardners' testimony because their names had not been disclosed in response to the interrogatories. He also asked for a mistrial. This was the first objection to the Gardners' testimony. At this point, it appears that approximately $2^{1}/_{2}$ hours had elapsed

after Dan Gardner was called to testify. During that time, three witnesses other than the Gardners had been called (two by the plaintiff), and there had been a 35-minute recess, which included a conference with the trial judge and the attorneys. During this time, there was no objection from plaintiff about the Gardners' testimony. The judge overruled both motions.

Plaintiff's counsel requested an opportunity to depose the Gardners the evening after their testimony and did depose Dan Gardner.

The plaintiff continued his rebuttal the following morning. David Duncan, a claims adjuster for an insurance company involved with the accident of April 2, 1986, testified that Dan Gardner had telephoned him on July 18, 1986, offering to sell information relating to plaintiff's alleged accident. Gardner suggested $250 initially, but stated that if he had to testify at a hearing or trial, it would cost more. Duncan later met with Gardner. Duncan testified as to that meeting as follows: " Q. So [Gardner] told you if you wouldn't give him the money he was going to say [the conversations with plaintiff about staging an accident] didn't happen; if you did give him the money he'd say it had happened? A. Yes, that's right." Duncan testified that Gardner told him that he had prior experience testifying for money. Duncan further testified that Gardner also told him that his wife, Christine, had made a similar deal with Blue Cross in another case. The insurance company for which Duncan worked did not use Gardner's statements.

On rebuttal, plaintiff testified that Dan Gardner bragged about selling testimony to Blue Cross in the earlier case involving Christine Gardner's parents. Plaintiff testified, "[Gardner] told me that in the beginning it was like a million dollar insurance policy on his wife, his father-in-law, and that if he would have information that would help the insurance company not to pay that claim that he would receive 10 percent of that money."

At the close of all the evidence, the trial judge and counsel met in chambers and plaintiff renewed his motion for mistrial. In support of this motion, plaintiff's counsel pointed out several facts about the Gardners that he discovered during the deposition the night before. Those facts allegedly included the

Gardners' prior illegal conduct and Dan Gardner's prior criminal record. The trial court summarized plaintiff's statements by saying to counsel, "In other words, a long litany that would, at least in your opinion, affect this gentleman's credibility." Plaintiff's counsel agreed with the court's statement and concluded by saying, "[W]e've been prejudiced."

Defendant's counsel objected to the statements of plaintiff's counsel and objected to inferences or statements

> about me and sandbagging or doing anything else to Mr. Rowen in that case or sandbagging [plaintiff's counsel] in this case. I think the record is clear that Liberty Mutual, their own people, knew about this guy [Gardner] since 1986. It's no surprise to anybody that this guy's out there. You guys are in bed with Liberty Mutual, and if they didn't tell you about him, I mean, that's your problem, it ain't mine.

The pretrial order, entered December 6, 1988, required that defendant list "all witnesses whom the defendant ConAgra expects to call to testify . . . except those who may be called for impeachment purposes only." This order was in addition to the interrogatory set out above which requested the names of persons known to "have knowledge of any facts relevant to the incident." Counsel for defendant contends the Gardners were impeachment witnesses only, and therefore, he did not have to disclose them.

We hold that the Gardners' testimony was substantive evidence, although it could be used to impeach. The statements of plaintiff to which the Gardners testified were admissions of a party-opponent, and therefore, defendant's counsel breached his duty to disclose the Gardners as persons with knowledge of discoverable facts.

Admissions by a party-opponent are admissible as substantive evidence. *United States v. Cline*, 570 F.2d 731 (8th Cir. 1978). In *Cline*, a criminal defendant testified that he had destroyed the gun used to commit the crime. The prosecution then called a witness who testified that the defendant had told him that the defendant had sold the gun. The defendant complained on appeal that the court should have instructed the jury to consider the witness' testimony only as impeachment

and not as substantive evidence. The U.S. Court of Appeals for the Eighth Circuit disagreed, stating:

> Furthermore, the testimony by [the witness] was admissible as substantive evidence because it qualified as an admission by appellant . . . . This testimony was relevant as direct evidence on the issue of concealment. . . . The testimony was not hearsay because it was appellant's own statement which was being offered against him.

*Cline*, 570 F.2d at 735-36.

Also distinguishing admissions of a party-opponent from impeachment is McCormack on Evidence § 262 at 776 (Edward W. Cleary 3d ed. 1984), which states:

> [I]t is clear that admissions of a party come in as substantive evidence of the facts admitted, and that no foundation or predicate by first examining the party himself, as distinguished from the usual procedure for impeaching a witness by proof of his prior inconsistent statement, is a prerequisite for proof of admissions.

We took the same position in *Silvey & Co., Inc. v. Engel*, 204 Neb. 633, 284 N.W.2d 560 (1979). *Engel* involved an accident in which the truck of the plaintiff corporation went into the ditch as the defendant's car came into the passing lane in front of the truck. Engel testified at trial that he was in the passing lane before the truck. A patrolman testified that Engel told him that he started to pass a vehicle and did not see the truck already in the passing lane. The plaintiff also offered testimony from the passenger in Engel's car that Engel told him he owed the truckdriver his life. The court refused to admit the passenger's testimony.

In *Engel*, the trial court instructed the jury as follows:

> "You have heard testimony concerning statements allegedly made by a witness prior to this trial which may be inconsistent with his testimony at trial. This testimony has been admitted solely for impeachment purposes to aid you in estimating the credibility of the witness and to determine the weight to be given to his testimony. You may consider it for that limited purpose only and not as evidence of the facts declared in the prior statement."

(Emphasis omitted.) *Engel*, 204 Neb. at 635, 284 N.W.2d at

561.

We held that the testimony of the passenger should have been admitted because it was an admission of a party-opponent. "The admissions by a party to an action upon a material matter are admissible against him as original evidence." *Engel*, 204 Neb. at 636, 284 N.W.2d at 562. See, also, *Hyde v. Cleveland*, 203 Neb. 420, 279 N.W.2d 105 (1979). We also held that the jury instruction limiting consideration of Engel's inconsistent statements to impeachment was plain error.

The Engel situation presented much the same situation as that which is before us. In this case, the Gardners' testimony had an impeaching aspect, but was properly admissible as substantive evidence and would have been admissible even if plaintiff had never taken the stand. In the case before us, the court did admit that testimony as substantive evidence and did not instruct the jury to view the Gardners' testimony only for impeachment purposes.

Admissions of a party-opponent are admissible evidence and therefore discoverable under Neb. Ct. R. of Discovery 26(b)(1) (rev. 1989), even though they may be used for impeachment purposes. See *Ferlise v. Raznick*, 202 Neb. 745, 277 N.W.2d 94 (1979). We stated in *Ferlise*, " 'The applicable rule is that extrajudicial statements of fact made by a party relating to matters material to the issues in a controversy are available to the adverse party in a trial thereof as admissions against interest or for impeachment.' " 202 Neb. at 748, 277 N.W.2d at 96 (quoting *Dorn v. Sturges*, 157 Neb. 491, 59 N.W.2d 751 (1953)). Simply because a party may choose to use the admissions as impeachment does not make the admissions any less discoverable.

Rule 26(b)(1) of the Nebraska Discovery Rules states, in part:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including . . . the identity and location of persons having knowledge of any discoverable matter.

Even if the Gardners' testimony was used only for impeachment purposes, defendant's counsel was required to disclose them as persons with knowledge of relevant facts. Rule 26 requires supplementation of interrogatories asking for persons with knowledge of relevant facts.

We discussed the policies served by a liberal discovery process in *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 536, 407 N.W.2d 146, 153 (1987):

> A purpose of the discovery process is exploration of all available and properly discoverable information to narrow the fact issues in controversy so that a trial may be an efficient and economical resolution of a dispute. . . . Also, the discovery process provides adequate pretrial preparation as a basis for an informed cross-examiner and informative cross-examination. Further, the discovery process enables litigants to prepare for a trial without the element of an opponent's tactical surprise, a circumstance which might lead to a result based more on counsel's legal maneuvering than on the merits of the case.

*Norquay* dealt with disclosing expert witnesses expected to be called at trial. Defendant contends that *Norquay* is distinguishable because it concerns an expert witness. This contention is without merit. Neb. Ct. R. of Discovery 27(e) (rev. 1989) states, in part:

> Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his or her response to include information thereafter acquired, except as follows:
>
> (1) A party is under a duty seasonally to supplement his or her response with respect to any question directly addressed to
>
> (A) the identity and location of persons having knowledge of discoverable matters, and
>
> (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he or she is expected to testify, and the substance of his or her testimony.

Rule 26 states that a party has the same duty to supplement

discovery requests asking for the identity of persons with knowledge of discoverable matters as it has to supplement the testimony of experts expected to be called. *Norquay* is applicable to this case.

In *Norquay*, 225 Neb. at 538, 407 N.W.2d at 154, we stated:

> "For a party to sit idly by, knowing that a previous answer he has given in response to discovery is no longer truthful in the light of his present information, is intolerable. It is inconsistent with the purpose of the rules to avoid surprise and it is inconsistent with the standards of conduct that one expects in a learned and honorable profession." . . .
>
> ". . . With the expert witnesses, as with the persons having knowledge of discoverable facts, any change in plan would routinely come to the attention of the lawyers for the party and the burden of supplementation is very small."

We recognize that it is not always possible to know at a pretrial conference which witnesses may be needed for rebuttal. When need for a witness' testimony cannot be anticipated, the witness may be allowed to testify even if not disclosed in a pretrial order. See *Chicago Lumber Co. v. Gibson*, 179 Neb. 461, 138 N.W.2d 832 (1965). Those circumstances are not present in this case.

We hold that defendant's counsel did not comply with the applicable discovery rules when he failed to disclose the Gardners as witnesses who would be called and witnesses who had knowledge of facts of the incident. It is clearly no response to that duty to state, as did defendant's counsel, "You guys are in bed with Liberty Mutual, and if they didn't tell you about him, I mean, that's your problem, it ain't mine." It is not a question about whose problem it is; the concern is that lawyers follow the rules and orders of the court. As *Norquay* stated, " ' "[Such conduct] is inconsistent with the standards of conduct that one expects in a learned and honorable profession." ' " 225 Neb. at 538, 407 N.W.2d at 154.

Although defendant was guilty of misconduct in failing to supplement the responses to interrogatories, plaintiff failed to preserve the error for appeal. This court has held that a party who objects to certain evidence must preserve the error, stating:

Ordinarily an objection must be made as soon as the applicability of it is known, or could reasonably have been known to the opponent. Objection to a witness' disqualification should ordinarily be made as soon as he is called to the stand, providing his disqualification is then known. See I Wigmore on Evidence (3d Ed.) § 18, p. 323. We see no reason why the same general rules should not apply to the introduction of testimony of a witness whose name has not been properly disclosed in answer to an interrogatory.

While we in no sense attempt to explain the failure of counsel to disclose the names of the witnesses, it is still incumbent upon opposing counsel to make objection promptly. . . . Counsel should not be permitted to withhold objection, proceed with full and extensive cross-examination, and then decide whether or not the testimony was prejudicial.

*Cardenas v. Peterson Bean Co.*, 180 Neb. 605, 612, 144 N.W.2d 154, 159 (1966).

In *Cardenas*, the defendant did not disclose the names of three witnesses in its answers to interrogatories. The witnesses testified to conversations had with the plaintiff. The plaintiff did not object, but cross-examined the witnesses and presented rebuttal evidence. At the conclusion of the case, in answer to a question, defendant's counsel stated he first knew of the witnesses 3 months before responding to the interrogatories. The plaintiff then moved to strike the testimony for the first time because the witnesses were not disclosed in the answers to interrogatories. The motion was denied as untimely, and the denial was affirmed in this court.

In *State v. Archbold*, 217 Neb. 345, 350 N.W.2d 500 (1984), the prosecutor adduced evidence on cross-examination that the defendant had previously committed a crime similar to that for which she was being tried. Her counsel did not object, and the prosecutor continued with the cross-examination. After commencing redirect examination, defense counsel moved for a mistrial and to strike the testimony. The court overruled both motions. This court held that the objection was not timely, stating:

A litigant may not speculate about the answer to a question and then, after answer has been given, for the first time lodge his objection. . . .

In order to be timely an objection must ordinarily be made at the earliest opportunity after the ground for the objection becomes apparent. A motion to strike is not timely where testimony has been adduced without objection and the grounds for the motion to strike should have been apparent before the motion to strike is made. . . .

When a party has knowledge during trial of irregularity or misconduct, he must timely assert his right to a mistrial. *State v. Archbold*, 217 Neb. at 352, 350 N.W.2d at 505.

The Gardners' disqualifications appear to have been known to plaintiff at the time of their testimony. The fifth question plaintiff's counsel asked Dan Gardner on cross-examination was: "Q, Now, your name hadn't been listed in any — well, strike that. You wouldn't know the answer to that. You've talked to Mr. Thomas about your testimony here before, you talked to him before it, haven't you?" It could fairly be deduced from that question that plaintiff's counsel knew, as he began his cross-examination, of Dan Gardner and that Gardner's name had not been listed in any documents submitted to plaintiff's counsel. Nonetheless, plaintiff's counsel continued his cross-examination without making any objection to Gardner as a witness.

The concept of objecting to the testimony of witnesses for the reason the witnesses were not listed by the opposing counsel was clearly not new to plaintiff's counsel. The first witness on the afternoon the Gardners testified was a witness called out of order by plaintiff. The testimony of this witness was objected to by defendant because "she was not disclosed as a witness to appear and testify on the Pre-trial Order and witnesses other than impeachment witnesses are required to be disclosed under the terms of that order . . . ." Plaintiff's counsel replied that the witness in question was "merely a foundational witness" and that plaintiff's counsel had given defendant's counsel "notice weeks before trial that we reserved the right to call foundational witnesses as necessary . . . ." The trial court overruled the

objection. Plaintiff's counsel was well aware of the opportunity to object to testimony of an unlisted witness.

In addition, we note that after the Gardners' testimony but before the objection to their testimony, another witness testified . for defendant and two witnesses testified for plaintiff. In connection with the second of these two witnesses, plaintiff attempted to adduce evidence from Thomas Rowen. As stated above, the majority of Rowen's testimony is before this court in the form of an offer of proof. In that offer, plaintiff set out a scenario which, if admissible and if believed by the jury, would have been helpful to plaintiff's case. The scenario indicated that Christine Gardner had previously testified against her father's interest at the request of John Thomas, and she was not listed as a witness in that case either. It was only after the trial court sustained defendant's objections to that testimony, that plaintiff sought a mistrial.

In *State v. Groves*, 239 Neb. 660, 673, 477 N.W.2d 789, 799 (1991), we stated: "The decision as to whether to grant a motion for mistrial is a matter within the discretion of the trial court, and such a ruling will be upheld absent an abuse of that discretion." That holding was set out in a criminal case, but we hold it applies in a civil case as well. To hold otherwise in this case would further reduce this trial to a game of chance, as criticized in *State v. Welsh*, 232 Neb. 219, 440 N.W.2d 225 (1989) (White, J., dissenting).

In this case it is not beyond the bounds of the trial court's discretion to determine that plaintiff took a calculated risk in trying to adduce evidence attacking the testimony of the Gardners and, when not totally succeeding in that approach, to then move for a mistrial or to strike. The trial court did not abuse its discretion in denying plaintiff's motions.

In light of our holdings on these issues, we do not reach the plaintiff's other assignments of error. We affirm.

AFFIRMED.

CAPORALE, J., not participating.