STATE OF NEBRASKA, APPELLEE, V. ROBERT D. SWOOPES, APPELLANT.

395 N.W.2d 500

Filed October 24, 1986.    No. 85-924.

Richard J. Epstein, for appellant.

Robert M. Spire, Attorney General, and Harold Mosher, for appellee.

K<small>RIVOSHA</small>, C.J., B<small>OSLAUGH</small>, W<small>HITE</small>, H<small>ASTINGS</small>, C<small>APORALE</small>, S<small>HANAHAN</small>, and G<small>RANT</small>, JJ.

K<small>RIVOSHA</small>, C.J.

Following trial to a jury, the appellant, Robert D. Swoopes, was found guilty of having committed several crimes. Specifically, he was convicted of burglary in violation of Neb. Rev. Stat. § 28-507(1) (Reissue 1985), attempted first degree sexual assault in violation of Neb. Rev. Stat. § 28-201 (Reissue 1985), assault in the second degree in violation of Neb. Rev. Stat. § 28-309(1) (Reissue 1985), and use of a knife to commit a felony in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1985). All of the offenses except second degree assault are Class III felonies, punishable by imprisonment for not less than 1 nor more than 20 years or a fine of not more than $25,000, or imprisonment and fine. The crime of assault in the second degree is a Class IV felony, punishable by imprisonment for not more than 5 years or a fine of not more than $10,000, or imprisonment and fine.

The district court sentenced Swoopes to imprisonment on the burglary conviction for a term of not less than 2 nor more than 5 years. The court then sentenced Swoopes on the attempted first degree sexual assault conviction to imprisonment for a term of not less than 5 nor more than 15 years, the sentence to be served consecutively to the sentence imposed on the burglary conviction. Swoopes was also at that time sentenced to imprisonment for a term of 2 years for committing assault in the second degree, the sentence to be served concurrently with the sentence imposed for the attempted first degree sexual

assault but consecutively to the sentence imposed for burglary. And, finally, the court sentenced Swoopes to a period of 10 years' imprisonment on the conviction of using a knife to commit a felony, the sentence to be served consecutively to the sentences imposed on the burglary, attempted first degree sexual assault, and assault in the second degree charges.

Swoopes now appeals to this court, maintaining that a series of errors were committed entitling Swoopes to a new trial. Specifically, his claims are that (1) the district court erred in overruling his motion to suppress the testimony given by various witnesses who identified him; (2) the district court committed error in refusing to grant his motion for mistrial when one of the investigators in the case testified that Swoopes' picture had been obtained from the Omaha Police Department, in spite of the fact that a motion in limine had been granted by the court; (3) the district court committed error when it refused to instruct the jury that it could find Swoopes guilty of third degree sexual assault as a lesser-included offense of attempted first degree sexual assault; (4) the district court erred in failing to sustain his motion to quash the information and suppress all evidence gained as the result of an allegedly illegal arrest; (5) the district court committed error when it permitted a police officer to testify over objection that the officer believed the story of another individual who could have been considered a suspect; and (6) the identification of Swoopes at both a photo lineup and a live lineup violated his right of due process because of a discussion between two of the witnesses and the victim in which one of the witnesses allegedly made comments which were highly suggestive and, therefore, unfairly bolstered and tainted the subsequent identification.

We have examined each of the allegations in light of the record presented to this court and conclude that none of the assignments are meritorious. We therefore affirm the convictions and sentences.

The record discloses that on September 25, 1984, the victim was in her kitchen with her 3-year-old daughter. She looked up and saw a man, later identified as Swoopes, standing in the doorway between the kitchen and hallway. He moved behind her, put a knife to her throat, and told her they were going

upstairs. He then proceeded in part to drag and in part to carry her toward the stairway. At this point a struggle ensued, and the parties moved back and forth between the kitchen and the hallway. During the struggle, the man reached down the victim's blouse and fondled her breast. The victim attempted to grab the knife away from the man and, in doing so, was cut on the hand. She eventually succeeded in getting loose and ran from the home to a neighbor's. The man then fled the home.

When law enforcement officials arrived, the victim described her assailant as a tall, thin, black man. Both Swoopes and another individual were contacted by the officials as possible suspects, but neither was arrested at that time. The officials then obtained a color photo of Swoopes from the Omaha Police Department and used that photo, together with four others, to create a photo lineup. When the photo lineup was shown to the victim, she was unable to make a positive identification of anyone in the photo lineup, although she indicated she thought that Swoopes' picture came closest to resembling her assailant. In none of the photos displayed was anyone wearing a hooded sweatshirt of the type worn by the assailant.

The officials then went to Swoopes' home and requested him to accompany them to the courthouse for a live lineup. At the live lineup, the victim positively identified Swoopes as her assailant. Swoopes was then placed under arrest.

Subsequently, five other individuals who had indicated that they had seen someone in the area when the assault occurred identified Swoopes through a photo lineup as the individual they had seen. Additionally, four of the neighbors were asked to view a live lineup, and they all identified Swoopes.

With these facts in mind, we now turn to each assignment of error.

## A.

*The district court committed reversible error in overruling the defendant's motion to suppress the identification of defendant by witnesses Janik, Robb, and Catlett.*

Swoopes' argument concerning this alleged error seems to be that because the officers had as many as 40 photographs at their disposal, the 5 which were selected were so prejudicial and improper as to entitle Swoopes to have the evidence of his

identification by use of the photographs suppressed. Additionally, and in connection with this same assignment of error, Swoopes maintains that the victim's emotional state at the time of the lineup was such that she could not have properly or fairly identified her assailant. And, finally, he argues that the officers suggested that one of the photographs shown the victim was of a suspect, thereby improperly prejudicing Swoopes with suggestive statements to the victim. Swoopes then argues that if the evidence concerning the photo lineup and the live lineup is suppressed, then the in-court identification must likewise be suppressed because the in-court identification was dependent upon either the photo lineup or the live lineup. We believe an examination of the record will disclose that none of these positions are correct statements of the law.

Swoopes is unable to cite to the court, nor is the court able to discover, any authority to support the proposition that 5 photographs do not constitute a sufficient array when 40 are available. It seems to the court relatively clear that an array of five photographs is sufficient to constitute a fair and adequate array when attempting to identify a single perpetrator.

Moreover, an examination of the photo lineup, exhibit 1 in this case, discloses that all of the photos were selected for the reason that they display individuals with similar characteristics, to wit, short hair and elongated, clean-shaven faces. Specifically, Investigator Hutton, the officer who prepared the photo array, testified as follows:

Q. Is there any reason that you chose not to show [the victim] all of those 30 or 40 pictures of black males along with the picture of [Swoopes]?

A. No other reason than that the face would have been too full or too big from what she described and would have made Mr. Swoops' [sic] picture stand out.

Q. Now, wait a second. You're telling the ladies and gentlemen of the jury the reason you didn't use the 30 to 40 photos of black men, because [Swoopes'] picture would have stood out?

A. If I used some of the people who had fuller faces or had more facial hair, yes, it would have made Mr. Swoops' [sic] picture stand out.

As already indicated, an examination of the exhibit discloses that although the five were obviously separate individuals with individual and unique characteristics who, therefore, did not look exactly alike, the array was not unduly suggestive. As noted by the U.S. Supreme Court in *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), each case must be considered on its own facts. Furthermore, one may determine that a lineup is impermissibly suggestive only by considering the totality of the circumstances. See *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

In *State v. Joseph*, 202 Neb. 268, 271, 274 N.W.2d 880, 883 (1979), we said: "The determination as to whether the identification procedures were unnecessarily suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be made by a consideration of the totality of the circumstances surrounding the procedures." We believe that when we consider the totality of the circumstances, the array was not unduly suggestive. See, also, *State v. Harris*, 205 Neb. 844, 290 N.W.2d 645 (1980). Nor does the fact that the victim was distraught make the lineup improper. It seems clear that if it is desirable to hold the lineup as soon after the event as is possible, it is likely that the victim may still be upset when viewing the lineup. That, in and of itself, is not sufficient to invalidate the lineup, though it may go to the question of reliability and credibility.

Nor does the fact that the victim has been advised that one or more of the persons in the lineup may be persons who the officers believe may have committed the offense make the lineup unduly suggestive. Obviously, the officers would not be asking the victim to view a lineup in which they knew none of the persons were possible suspects. See *State v. Joseph, supra*. Because we find that the photo array was not unduly suggestive, we may then disregard Swoopes' argument that the physical lineup and the in-court identification were tainted. Swoopes' assignment of error is without merit and must be overruled.

B.

*The district court committed reversible error in not granting the defendant's motion for mistrial when Investigator Hutton testified that he picked up a picture of the defendant from the*

*Omaha Police Department.*

Swoopes argues, in connection with his second assignment of error, that because he obtained an order from the district court sustaining a motion in limine forbidding the prosecution from introducing any evidence of any other crimes, wrongs, or acts which Swoopes allegedly committed, it was reversible error not to grant Swoopes a mistrial when Investigator Hutton testified on direct examination that he had picked up Swoopes' photograph at the Omaha Police Department. Swoopes objected to the answer on the basis that the question was "nonresponsive" and asked for a mistrial. The court granted "the motion to strike as being not responsive" and overruled the motion for mistrial. Although there was no motion to strike the testimony, the trial court, on its own motion, did strike the answer and instructed the jury to disregard the statement.

Swoopes' assignment of error is without merit for several reasons. To begin with, the objection made by counsel that the answer was "not responsive" was not a proper objection. One who wishes to object to an answer given by a witness to a question posed by opposing counsel may not object on the ground that the answer is not responsive, but must object on the ground that the answer is a voluntary statement or for some specific reason such as hearsay or a conclusion of the witness. Only the party asking the question can object on the ground that the answer is not responsive. See, *Isham v. Birkel*, 184 Neb. 800, 172 N.W.2d 92 (1969); *Cardenas v. Peterson Bean Co.*, 180 Neb. 605, 144 N.W.2d 154 (1966); *City of Indpls. v. Heeter et al.*, 171 Ind. App. 119, 355 N.E.2d 429 (1976).

Further, we believe that a reading of the entire record fails to disclose how the mere mention of the fact that the photograph was obtained from the Omaha Police Department prejudiced Swoopes in this case. We have previously held that a conviction will not be set aside unless the defendant meets his burden of showing that the error claimed created actual prejudice rather than merely the possibility of prejudice. See, *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983); *State v. Gore*, 212 Neb. 287, 322 N.W.2d 438 (1982); *State v. Vrchota*, 212 Neb. 567, 324 N.W.2d 394 (1982). We believe that Swoopes has not met his burden in

this regard, and the assignment of error must be overruled.

C.

*The district court committed reversible error by overruling defendant's motion to have the jury instructed on third degree sexual assault as a lesser-included offense of attempted first degree sexual assault.*

Swoopes argues that, in addition to having the jury instructed on attempted first degree sexual assault, he was entitled to have the jury instructed on the offense of third degree sexual assault. We believe, however, that under the rules in this jurisdiction the contention is without merit. In *State v. Lovelace*, 212 Neb. 356, 359, 322 N.W.2d 673, 675 (1982), we held:

"A lesser included offense is one which is necessarily established by proof of the greater offense. [Citation omitted.] To be a lesser included offense, the elements of the lesser offense must be such that it is impossible to commit the greater without at the same time having committed the lesser. [Citation omitted.] In sum the lesser included offense is one all the elements of which are necessarily included in the greater. [Citations omitted.]"

Under that definition we do not believe that third degree sexual assault is a lesser-included offense of *attempted* first degree sexual assault.

Neb. Rev. Stat. § 28-320(1) (Reissue 1985) provides:

Any person who subjects another person to sexual contact and (a) overcomes the victim by force, threat of force, express or implied, coercion, or deception, or (b) knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct is guilty of sexual assault in either the second degree or third degree.

In order for one to commit the offense of sexual assault in either the second or third degree, the person must be subjected to actual sexual contact. In order, however, to commit the offense of *attempted* sexual assault in any degree, no actual sexual contact or penetration is required. All that is required, according to § 28-201(1), is that one

(a) Intentionally engages in conduct which would

constitute the crime if the attendant circumstances were as he believes them to be; or

(b) Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.

Further, § 28-201(2) provides:

When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

That is, one may commit *attempted* first degree sexual assault without ever having made sexual contact but by merely taking a substantial step toward sexual contact. Because an attempted crime as defined by § 28-201 may be committed without the crime itself being committed, no offense can be a lesser-included offense of an *attempted* crime prosecuted under § 28-201. There are no lesser-included offenses to § 28-201, and the district court was correct in refusing to instruct the jury on a lesser-included offense. The assignment is overruled.

### D.

*The district court committed reversible error by overruling defendant's motion to quash the information and suppress all evidence gained as a result of an illegal arrest.*

Swoopes next maintains that because he was arrested prior to the issuance of an arrest warrant, he was illegally taken into custody and required to participate in a physical lineup. In support of his position Swoopes cites *INS v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984), and *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). While we agree with the authorities cited to us by Swoopes, we do not believe that the evidence supports his conclusion in this case.

The record discloses that on September 26, 1984, investigators from the Sarpy County sheriff's office went to the home of Swoopes' parents, where Swoopes was then residing.

The officers testified at the pretrial hearing that they were invited into the home by Swoopes. The investigators further testified that they then requested Swoopes to accompany them to the courthouse for a lineup. Swoopes was not searched, was not handcuffed during the trip to the police station, and rode in the front seat of the unmarked cruiser. Although Swoopes maintained that he had been told to accompany the officers, there was no evidence that Swoopes protested or refused to go. Nor is there any evidence that he was required to accompany the officers or would have been charged with any crime at that moment had he refused.

In beginning to conduct our analysis of this issue, it is necessary that we keep in mind that where, as here, there is, at best, some conflict in the evidence, this court will not overturn the trial court's findings of fact when determining the correctness of the latter's rulings on motions to suppress unless those findings are clearly wrong. See, *State v. Beard*, 221 Neb. 891, 381 N.W.2d 170 (1986); *State v. Horn*, 218 Neb. 524, 357 N.W.2d 437 (1984). Similar situations have been recently presented to us. In *State v. Beard, supra* at 893, 381 N.W.2d at 172, the appellant Beard was identified as a boyfriend of the victim. Beard was then advised by a police officer that "I would like to talk to you at central station. I want to interview you." Beard, on the other hand, testified that the officer said, "I want to talk to you downtown." In any event, Beard made no complaint and was driven to police headquarters by the officer. He was not searched, was not handcuffed during the trip, and rode in the front seat of the cruiser. In holding that Beard was not then under arrest and, therefore, had not been taken into custody illegally, we said at 895-96, 381 N.W.2d at 173:

> Whether Beard voluntarily accompanied Wilson to police headquarters by not protesting and thus was not seized is a question of fact. Implicit in the trial court's rulings is the finding that Beard consented to make the trip to police headquarters. It is well established that this court will not overturn the trial court's findings of fact when determining the correctness of the latter's rulings on motions to suppress unless those findings are clearly wrong. . . .

. . . .

It is true that one's initially consensual encounter with the police may be transformed into an unreasonable seizure or detention by subsequent events. *Dunaway v. New York, supra.* However, in the absence of evidence that Beard gave any manifestation while being questioned that he sought to revoke his earlier consent, it cannot be said the trial court's implied finding that he did not later withdraw his consent is clearly wrong. It became clear during questioning that Wilson did not believe Beard was innocent of the crime, yet at no time did Beard ask that questioning stop and he be released.

Consequently, the trial court's finding that Beard's failing to protest rendered the trip to police headquarters consensual cannot be said to be clearly wrong, and Beard's first assignment of error therefore fails.

And, further, in *State v. Saylor, ante* p. 694, 392 N.W.2d 789 (1986), the appellant Saylor was asked to come to the police station to be fingerprinted. He voluntarily went to the station at about 12:35 or 12:40 p.m. He was then fingerprinted but not released. Saylor was taken to the chief of police's office, where he signed a *Miranda* warning and waiver form at 1:05 p.m. and was then questioned. Within a short period of time the detective's questions became accusatory. At that point, approximately 1:35 to 1:40 p.m., Saylor stated that he did not wish to be questioned further unless an attorney was present. He was then placed in a holding cell but was not allowed to contact an attorney. He was kept in police custody at the station until 8 or 8:30 that evening, when he was then released and permitted to return home. In holding that Saylor was not illegally taken to the police headquarters, we said at 699, 392 N.W.2d at 793:

According to the *Miranda* Court, custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra* at 444. Later, in *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), the Court emphasized that custody for

*Miranda* purposes requires restriction of one's freedom of movement, because that is the type of coercive environment to which the *Miranda* safeguards were directed. See, also, *State v. Parsons*, 213 Neb. 349, 328 N.W.2d 795 (1983).

We believe that the district court's finding that Swoopes voluntarily went with the officer to police headquarters cannot be said to be clearly wrong and, therefore, must stand. On that basis, then, Swoopes' contention that all evidence subsequently acquired should have been suppressed is without merit, and the assignment is overruled.

E.

*The district court committed reversible error in allowing Officer Rybar to testify over objection that he believed the story of Marion Jetton.*

Swoopes next argues that evidence was elicited from one of the officers at trial concerning another possible suspect and that the admission of the evidence was prejudicial, entitling Swoopes to a new trial. The record, however, discloses that on recross-examination, Swoopes' counsel asked the witness the following questions concerning the other suspect, Marion Jetton, and received the following answers:

Q. You just told Mr. Wellman that it's not your job to check these stories out or anything; is that correct?

A. Not at that point, no.

Q. Basically you —

A. I'm not obligated to.

Q. On September 25th you were a sworn police officer of the Bellevue Police Department, weren't you?

A. That's correct.

Q. And it was your responsibility to try to find the person that assaulted [the victim]; right?

A. That's correct.

Q. But you just didn't feel it was your job or you didn't have to worry about checking this Jetton's story out; right?

A. I wasn't really able to at that point check out any more than I did.

Q. Well, you didn't check it out at all, did you?

A. I checked it out to the extent I could, yes.

Q. Well, you didn't do anything; you talked to him and then put a field card in and let him go; right?

A. I checked the directory listings and — for the Courtney Street address —

Q. No, no, I'm talking about Jetton.

A. Oh, I'm sorry.

Q. This Jetton, also known as Zachery. Did you do anything? Did you check any of his story out?

A. I was already aware that the address he was giving me was correct as his residence. He did have a ten-speed bicycle there, and he had purchased some cigarettes in the store.

Q. You didn't bother about doing anything more 'cause it wasn't your job; right?

A. At that point I could not check his story out further, no.

It was then upon redirect that the State asked the witness:

Q. Didn't see any reason to check his story out further; is that what you're saying?

A. That's correct.

Q. Did you believe him?

A. Yes.

Swoopes argues that Officer Rybar's testimony that he believed Jetton was improper opinion testimony. The officer was not offering his statement that he believed Jetton was telling the truth as an opinion for the jury to consider; rather, it was offered as an explanation as to why he had not pursued Jetton as a suspect. That testimony was elicited by the State simply because Swoopes attempted, on recross, to create the impression that the officer ignored a viable suspect and unfairly pursued Swoopes. While we doubt, in light of the record as it presently exists, that the question was improper, even assuming but not deciding that it was, it does not entitle Swoopes to a new trial. The error, if any, was invited by Swoopes. It has always been the rule in this jurisdiction that a party cannot be heard to complain of an error which he himself has been instrumental in bringing about. See *State v. Bonaparte*, 222 Neb. 469, 384 N.W.2d 304 (1986). Here, Swoopes attempted to create an

illusion through a line of questions that there was another, more viable suspect who was ignored by the police. An explanation as to why the officer did not further pursue a second suspect was a fair question in light of Swoopes' recross. The assignment is overruled.

F.

*The identification of the defendant at the photo lineup and live lineup by witnesses violated defendant's right of due process because preshowup and prelineup discussion between the witnesses and the victim was highly suggestive and unfairly bolstered and tainted their subsequent identification of this defendant.*

Swoopes, as a last assignment of error, argues that two witnesses, before their identification of the defendant, met with the victim and discussed with her the assault as well as the defendant. He therefore maintains that this meeting by the witnesses with the victim prior to their identification of the defendant led to a miscarriage of justice. We do not believe the record will support that claim.

The record discloses that after the victim had viewed the lineups but prior to the time that the other witnesses viewed them, there was a brief conversation between the victim and the two witnesses. The defendant was briefly mentioned, and then one of the witnesses left. Swoopes suggests that the defendant was further discussed after one of the witnesses left, but there was no actual evidence of what in fact was discussed. The mere assertion by Swoopes that some discussion must have occurred which resulted in prejudice is not sufficient to meet his burden. The evidence is simply insufficient to support Swoopes' claimed error. See *State v. Van Egmond*, 206 Neb. 356, 293 N.W.2d 74 (1980).

Having therefore concluded that all of the assignments of error must be overruled, we affirm the convictions and sentences.

AFFIRMED.