STATE OF NEBRASKA, APPELLEE, V.
KAMIL H. AL-ZUBAIDY, APPELLANT.

559 N.W.2d 774

Filed January 14, 1997. No. A-96-012.

Alan G. Stoler for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and IRWIN, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Kamil H. Al-Zubaidy appeals from his convictions of attempted first degree murder, second degree assault, and two counts of use of a weapon in the commission of a felony. Appellant challenges the district court's refusal to instruct the jury on attempted second degree murder and attempted manslaughter as lesser-included offenses of attempted first degree murder and the district court's refusal to allow appellant to present extrinsic evidence to impeach one of the State's witnesses. Because we find that the evidence presented did not warrant a lesser-included offense instruction and because appellant failed to provide the witness to be impeached an opportunity to deny or explain the alleged impeachment, we affirm.

## II. BACKGROUND

On December 9, 1994, appellant's wife, Anita Al-Zubaidy, told him she was leaving him and took the couple's infant son to the home of one of Anita's friends, Ann Brown. On the evening of December 9, appellant returned home from work, found Anita had left, and telephoned Brown's home looking for Anita. Appellant eventually went to Brown's home to speak to Anita, and Anita refused to allow appellant into the home. At

some point the police were called, and appellant left the residence before the police arrived.

James Fritts testified that appellant came to Fritts' apartment on December 10, 1994, looking for Anita. Fritts informed appellant that he had not seen Anita. Appellant asked Fritts to call a phone number looking for Anita, which Fritts agreed to do. According to Fritts, Brown answered the phone and then gave the phone to Anita. Fritts testified that appellant wanted to speak to Anita, but that Anita told Fritts she did not wish to speak to appellant. Fritts then hung up the phone.

Fritts testified that appellant dialed a number on Fritts' telephone, did not seem to get any answer, and then hung up the phone and began crying. Fritts testified that appellant told him that the problems between appellant and Anita were being caused by Brown. Fritts testified that appellant then said that "he knew where [Brown] worked and that Monday [December 12, 1994] he was going to kill her." Fritts told appellant that he needed to be patient, but appellant "just insisted that he was going to kill Ann Brown."

After appellant left Fritts' apartment, Fritts called Brown's home again and spoke to Brown. Fritts informed Brown that appellant had left Fritts' apartment and was acting very threatening toward Brown and was threatening to kill her. Anita testified that she and Brown then began calling friends, trying to find somewhere to go, although they were unable to find anyone at home. Anita testified that her brother then called, saying that appellant was at her parents' home and that appellant wanted to speak to her. According to Anita, appellant was on the phone and sounded "very angry," so she hung up on him.

Anita testified that appellant and one of appellant's friends arrived at Brown's home at approximately 10:30 p.m. on December 10, 1994. Anita spoke to appellant's friend through the front window while Brown called the 911 emergency service from the kitchen. Anita testified that Brown's son, Tierney, and several of his friends were also at the home, in the basement. According to Anita, she heard Brown "screaming into the phone, oh my God, he's coming through the back door and he's got a knife."

Anita testified that she then observed appellant stabbing Brown in the chest, arm, and wrist with a knife. Brown's daughter Seana tried to pull appellant off Brown, and appellant stabbed Seana in the shoulder. Anita testified that she next observed Tierney and one of his friends grabbing appellant and attempting to get appellant out of the home. Brown ran through the home to her bedroom. Anita testified that she checked on Brown, then went across the street to use a neighbor's phone, because Brown's phone had been pulled off of the wall.

According to Anita,

> [t]here was blood splattered everywhere. The kitchen was just all covered with blood. And there was blood in the living room all over the walls from when Seana ran through. And there was blood back in Ann's bedroom. There was blood all over the living room carpet from when the paramedics were working on Ann.

Both Brown and Seana testified substantially in accordance with Anita concerning the events of December 9 and 10, 1994. Additionally, Tierney and one of his friends, Daniel Watson, testified on behalf of the State. Tierney and Daniel testified that Tierney pulled appellant off of Seana, that Tierney and Daniel chased him outside, and that Tierney and his friends began hitting the car appellant was in with a baseball bat and other objects. Daniel testified that he used a towel to grab hold of the knife and take it from appellant during the struggle. Finally, two police officers who had responded to a call to the scene testified for the State.

Appellant testified that the events of December 10, 1994, were far different from those testified to by the State's witnesses. According to appellant, Fritts told appellant that Brown was the cause of the problems between appellant and Anita. Appellant denied intending to kill Brown and denied telling Fritts that he was going to kill Brown. Appellant testified that he went to Brown's on December 10 to take some of their child's belongings to Anita.

Appellant testified that he had always before entered Brown's home through the back door, so he went immediately to the back door on December 10, 1994. Appellant testified that the door was locked when he first arrived, but that "[a] guy

came from the basement," opened the door, and began yelling, "[H]ere he is, here he is." Appellant testified that he then entered the kitchen and that Brown began yelling, "[C]ome here and kill him, come here and kill him." According to appellant, Brown hit him in the forehead with the telephone. Appellant testified that a group came from the basement and began to "strike" and attack him. Appellant also testified that one of the males in the group stabbed him in the shoulder.

Appellant then testified that he saw a knife on a table in the kitchen and grabbed it to defend himself. Appellant testified that he attempted to flee, but was grabbed by Brown and Seana, and that he had to stab them in order to get away from the home. Finally, appellant testified that he suffered no cuts or bruises from being hit in the head with the phone and that he did not need stitches for the "stab" wound in his shoulder.

Appellant offered the testimony of another witness, John Ways, whom appellant had met while in custody awaiting trial. Appellant proposed to question Ways concerning a conversation Ways allegedly had with Seana wherein Seana told Ways that "people in the house," including her brother's friends, had jumped appellant and that appellant had grabbed a knife from a table while they were beating him. Appellant offered this testimony as extrinsic evidence of a prior inconsistent statement to impeach Seana's testimony at trial. The State argued that Seana was out of the jurisdiction, in Michigan, and that she would therefore have no opportunity to explain or deny the alleged prior inconsistent statement. The court refused to allow Ways to testify.

After the conclusion of the evidence, a jury instruction conference was held. Appellant's attorney requested an instruction on self-defense, but stated that no lesser-included offense instruction was requested regarding the attempted first degree murder charge, because "the Supreme Court's made it clear that there are no lesser included offenses whenever the charge is criminal attempt."

The jury returned verdicts of guilty on all four counts, attempted first degree murder, second degree assault, and two counts of use of a weapon to commit a felony. The court sentenced appellant to 30 to 40 years' imprisonment on the

attempted first degree murder conviction, 4 to 5 years' imprisonment on the second degree assault conviction, and 10 to 20 years' imprisonment on each of the use of a weapon to commit a felony convictions. The court further ordered that the sentences were to be served consecutively to each other. This appeal timely followed.

### III. ASSIGNMENTS OF ERROR

On appeal, appellant assigns two errors: First, appellant asserts that the district court erred in failing to instruct the jury on attempted second degree murder and attempted manslaughter as lesser-included offenses of attempted first degree murder, regardless of whether the court was requested to so instruct the jury or not. Second, appellant asserts that the district court erred in refusing to allow extrinsic evidence to impeach Seana.

### IV. ANALYSIS

#### 1. LESSER-INCLUDED OFFENSE INSTRUCTION

■ A party who does not request a desired jury instruction cannot usually complain on appeal about incomplete instructions. See *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994). However, a trial judge has a duty to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue in the case are prejudicially erroneous. *State v. Willams*, 247 Neb. 931, 531 N.W.2d 222 (1995); *State v. Grimes*, 246 Neb. 473, 519 N.W.2d 507 (1994); *State v. Myers, supra.*

#### (a) Generally

##### *(i) Lesser-Included Offenses Generally*

The law in Nebraska concerning when a jury must be instructed on lesser-included offenses has undergone several significant changes. In *State v. Lovelace*, 212 Neb. 356, 322 N.W.2d 673 (1982), the Nebraska Supreme Court purported to adopt the "elements test" for determining whether one offense is a lesser-included offense of another. The Supreme Court held that a lesser-included offense is one which is necessarily established by proof of the greater offense because all of the ele-

ments of the lesser-included offense are necessarily included in the elements of the greater offense. *Id.*

In *State v. Garza*, 236 Neb. 202, 205, 459 N.W.2d 739, 741 (1990), the Nebraska Supreme Court recognized that *State v. Lovelace, supra,* had expressed the "common-law or strict statutory approach" to lesser-included offenses. The Supreme Court, however, went on to recognize that other decisions of the Supreme Court since *State v. Lovelace* had not strictly followed the "statutory-elements approach." *State v. Garza, supra.* The Supreme Court concluded that the pre-*Lovelace* rule, the "cognate-evidence approach" to lesser-included offenses, was the better rule and overruled *State v. Lovelace* to the extent it conflicted with that approach. *State v. Garza, supra.* The cognate-evidence approach determined whether a lesser-included offense existed based upon the elements of the crime as charged in the information and the evidence adduced to support the charge, rather than focusing solely on the strict statutory elements of the two crimes. *Id.*

The law of lesser-included offenses changed again, however, when the Supreme Court decided *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993). In *State v. Williams*, the Supreme Court noted the difficulties associated with attempting to apply the cognate-evidence approach and returned to the strict statutory-elements approach espoused in *State v. Lovelace, supra.* The Supreme Court specifically overruled several decisions, including *State v. Garza, supra*, to the extent they rely upon and apply the cognate-evidence approach. *State v. Williams, supra.*

As a result of the Supreme Court's opinion in *State v. Williams*, courts must engage in a two-step test for determining whether or not a lesser-included offense instruction should be given: First, the court must determine whether the lesser crime is actually a lesser-included offense of the greater crime; second, if the court determines the lesser crime is actually a lesser-included offense, then the court must determine whether the evidence presented at trial justifies an instruction on the lesser-included offense. *State v. Williams, supra.* In resolving the first step, the applicable test is that to be a lesser-included offense, the statutory elements of the lesser offense must be such that it is impossible to commit the greater offense without at the same

time having committed the lesser offense. *Id.* In resolving the second step, the applicable test is that a lesser-included offense instruction is justified if the evidence adduced at trial provides a rational basis for the jury to return a verdict acquitting the defendant of the greater offense, but convicting him of the lesser offense. *Id.*

### (ii) Lesser-Included Offenses of Attempted Crimes

In parallel with the progression of the law in Nebraska concerning lesser-included offenses generally has been a progression of the law concerning lesser-included offenses of criminal attempt. In *State v. Swoopes*, 223 Neb. 914, 395 N.W.2d 500 (1986), the Supreme Court cited *State v. Lovelace*, 212 Neb. 356, 322 N.W.2d 673 (1982), for the general rule concerning lesser-included offenses. To the specific question whether third degree sexual assault could be considered a lesser-included offense of attempted first degree sexual assault, the Supreme Court, based on the rule from *State v. Lovelace*, answered in the negative. *State v. Swoopes, supra.* The Supreme Court held that "[b]ecause an attempted crime as defined by [Neb. Rev. Stat.] § 28-201 [(Reissue 1995)] may be committed without the crime itself being committed, no offense can be a lesser-included offense of an attempted crime prosecuted under § 28-201." (Emphasis omitted.) *State v. Swoopes*, 223 Neb. at 922, 395 N.W.2d at 506.

In *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987), the Nebraska Supreme Court revisited the issue of lesser-included offenses of criminal attempt. To the specific question whether attempted second degree sexual assault could be considered a lesser-included offense of attempted first degree sexual assault, the Supreme Court answered in the affirmative. *Id.* The Supreme Court held that "a substantial step in a course of conduct intended to culminate in a sexual assault in the first degree . . . may include a substantial step in a course of conduct intended to culminate in . . . commission of a sexual assault in the second degree." *Id.* at 856, 408 N.W.2d at 729. In reference to the topic of lesser-included offenses of criminal attempt, the Supreme Court overruled *State v. Swoopes, supra*, to the extent *Swoopes* held that there can be no lesser-included offenses of an attempted crime. *State v. Jackson, supra.*

In *State v. Garza*, 236 Neb. 202, 459 N.W.2d 739 (1990), the Nebraska Supreme Court also revisited the law of lesser-included offenses in the context of criminal attempt. The Supreme Court, after overruling *State v. Lovelace, supra*, held that overruling *State v. Swoopes, supra*, was improvident. *State v. Garza, supra*. The Supreme Court held that under the cognate-evidence approach, "[a]s an attempted crime may be committed in an infinite variety of ways by acts which without the requisite intent are entirely innocent, the doctrine, under the cognate theory readopted earlier, simply becomes unworkable in the context of attempted crimes." *Id.* at 208, 459 N.W.2d at 743. As a result, the Supreme Court overruled that portion of *State v. Jackson, supra*, which overruled *State v. Swoopes, supra. State v. Garza, supra.*

The Nebraska Supreme Court has not discussed lesser-included offenses in the context of attempted crimes since *State v. Garza, supra*. However, in *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993), the Supreme Court expressly overruled *State v. Garza* to the extent *State v. Garza* relied upon and applied the cognate-evidence approach. The portion of *State v. Garza* which overruled *State v. Jackson*'s holding that there could be lesser-included offenses of criminal attempt was explicitly based upon the cognate-evidence approach and, therefore, was overruled in *State v. Williams, supra*. As a result, it appears that the general two-step approach of *State v. Williams, supra*, for determining whether a lesser-included offense instruction is warranted should apply to attempted crimes as well.

### (b) Attempted Second Degree Murder

The first step in determining whether a lesser-included offense instruction on attempted second degree murder was warranted in the present case is to determine if attempted second degree murder is actually a lesser-included offense of attempted first degree murder. See *State v. Williams, supra*. As charged in the present case, the statutory elements of attempted first degree murder are these: a substantial step in a course of conduct intended to culminate in the commission of a purposeful, malicious, premeditated killing of another person. § 28-201

and Neb. Rev. Stat. § 28-303 (Reissue 1995). The statutory elements of attempted second degree murder are these: a substantial step in a course of conduct intended to culminate in the commission of an intentional killing of another person. § 28-201 and Neb. Rev. Stat. § 28-304 (Reissue 1995). Additionally, the Nebraska Supreme Court has held that malice is a necessary element of second degree murder and, by implication, attempted second degree murder. See *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994). When comparing the strict elements of the two crimes, it is apparent that attempted second degree murder is actually a lesser-included offense of attempted first degree murder.

The second step in determining whether a lesser-included offense instruction on attempted second degree murder was warranted in the present case is to determine if the evidence adduced at trial produced a rational basis for the jury to return a verdict acquitting appellant of attempted first degree murder, but convicting him of attempted second degree murder. See *State v. Williams, supra.* The testimony at trial on appellant's behalf was based upon a theory of self-defense. Appellant testified that he was jumped by a group at Brown's home, that Brown screamed at the group to kill appellant, that the group began beating him, and that he grabbed the knife and stabbed Brown in an effort to defend himself and flee from her home. The evidence produced by appellant reasonably provided the jury with a rational basis to acquit him of attempted first degree murder, but the self-defense theory would also have been applicable to any instructed charge of attempted second degree murder. In other words, appellant did not present any evidence which would reasonably provide the jury with a rational basis to find that appellant intentionally and maliciously attempted to kill Brown, but did so without premeditation. As such, the instruction was not warranted by the evidence presented in this case.

### (c) Attempted Manslaughter

This court has twice discussed the topic of "attempted manslaughter." See, *State v. Smith*, 3 Neb. App. 564, 529 N.W.2d 116 (1995); *State v. George*, 3 Neb. App. 354, 527 N.W.2d 638 (1995). Criminal attempt requires a person to

*intentionally* engage in conduct which constitutes a substantial step in a course of conduct intended to culminate in the commission of a crime. § 28-201. See, also, *State v. Smith, supra*; *State v. George, supra*. By contrast, manslaughter is an *unintentional* killing, without malice, either upon a sudden quarrel or while in the commission of an unlawful act. Neb. Rev. Stat. § 28-305 (Reissue 1995). See, also, *State v. Smith, supra*; *State v. George, supra*.

■ "A person cannot perform the same act intentionally and unintentionally at the same time." *State v. George*, 3 Neb. App. at 358, 527 N.W.2d at 642. In *State v. George*, this court held that the crime of attempted involuntary manslaughter (while in the commission of an unlawful act) does not exist in Nebraska. In *State v. Smith*, this court held that the crime of attempted voluntary manslaughter (upon a sudden quarrel) does not exist in Nebraska. Because it is fundamental that a person cannot intentionally take a substantial step toward the commission of a crime which is, by its terms, involuntary, there is no such crime as attempted manslaughter.

### (d) Resolution

Because the evidence did not warrant the giving of an instruction on attempted second degree murder, the district court did not err in failing to give such an instruction. Because there is no such crime in Nebraska as attempted manslaughter, the district court did not err in failing to give an instruction on the crime of attempted manslaughter as a lesser-included offense of attempted first degree murder. This assigned error is without merit.

### 2. EXTRINSIC EVIDENCE FOR IMPEACHMENT PURPOSES

Appellant offered to present testimony from a witness concerning an alleged prior inconsistent statement made by one of the State's witnesses, Seana, who was also the victim of the second degree assault charged in this case, concerning the events at Brown's home on the evening of December 10, 1994. Seana testified substantially in accordance with Anita and Brown that appellant came to the home, broke through the back door with a knife in his hand, began stabbing Brown, and stabbed Seana

when she attempted to assist Brown. The witness appellant wished to call would have testified that he had a conversation with Seana in which Seana told the witness that a group including her brother's friends jumped appellant when he arrived at Brown's home, that they began beating appellant, and that appellant grabbed a knife from a table when they were beating him.

Seana testified during the State's case in chief. She testified that she had moved to Michigan, and she then provided her testimony as described above. During cross-examination, appellant did not confront Seana with the alleged prior inconsistent statement. At the conclusion of Seana's testimony, appellant did not request that Seana remain subject to recall, nor did he in any way suggest to the State that there was a need for Seana to remain in Nebraska to possibly explain or deny a prior inconsistent statement. The court dismissed Seana. It is apparent from the dialog between the attorneys at the time of the proffered extrinsic testimony concerning the alleged prior inconsistent statement that Seana returned to Michigan after testifying.

■ Neb. R. Evid. 613(2), Neb. Rev. Stat. § 27-613(2) (Reissue 1995), governs the use of extrinsic evidence to impeach a witness through demonstrating a prior inconsistent statement. Rule 613(2) provides in part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require."

■ The Nebraska Supreme Court has discussed the foundational requirement of rule 613(2), that the witness be afforded an opportunity to explain or deny the alleged prior inconsistent statement, on two occasions. In *State v. Price*, 202 Neb. 308, 275 N.W.2d 82 (1979), the Supreme Court held that the foundational requirement may be met either before or after the introduction of the extrinsic impeaching evidence. In *State v. Johnson*, 220 Neb. 392, 370 N.W.2d 136 (1985), the Supreme Court again held that the extrinsic impeaching evidence may be introduced before the witness is given an opportunity to explain or deny the alleged prior inconsistent statement, depending upon the defendant's strategy.

In the present case, the State argues that Seana became unavailable after testifying and, therefore, would not have had an opportunity to éxplain or deny the alleged prior inconsistent statement. Appellant argues that the decision not to confront Seana with the statement during her testimony was a tactical decision and that he was never notified that she would become unavailable.

In the present case, Seana's testimony established that she lived in Michigan. It is apparent that appellant had knowledge of the alleged prior inconsistent statement at the time of Seana's testimony, as appellant argues that the decision not to confront her was a "tactical" decision, and appellant does not argue that this is a case where the alleged prior inconsistent statement was discovered after Seana became unavailable. Additionally, appellant did nothing to place anyone on notice that Seana would need to remain in Nebraska for purposes of having an opportunity to explain or deny the alleged prior inconsistent statement.

Under similar circumstances, the 11th Circuit Court of Appeals in *Wammock v. Celotex Corp.*, 793 F.2d 1518, 1524 (11th Cir. 1986), held that where

> counsel had sufficient knowledge such that action of some kind was required, whether it be to generally inquire of the witness as to [the prior statement] or to alert the court to the fact that counsel sought to pursue the matter later after further preparation [but counsel] failed to do either, counsel ran the risk that the witness would become unavailable . . . .

Speaking in reference to Fed. R. Evid. 613(b), which is almost identical to Nebraska's rule 613(2), Weinstein has suggested that the impeaching party would seem sufficiently to comply with the rule if he informs both the court and opposing counsel at the time the witness to be impeached testifies that he intends to introduce an allegedly inconsistent prior statement and that his opponent may, therefore, wish to keep the witness available to be called to explain or deny the alleged inconsistency. 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence § 613[04] (1996).

On the facts of the present case, it is apparent that Seana would not have had an opportunity to explain or deny the

alleged inconsistent prior statement had Ways been allowed to testify. Appellant was aware that Seana was living in Michigan when she testified, and he did nothing to suggest to anyone that there was reason for her to remain in Nebraska after her testimony was finished. Because rule 613(2) requires that the party to be impeached be given an opportunity to explain or deny the inconsistent statement, and because such an opportunity would have been denied Seana in the present case, the district court did not err in refusing to allow the extrinsic evidence. Additionally, appellant has not demonstrated that the interests of justice require dispensing with the foundational requirement of rule 613(2) in the present case. This assigned error is without merit.

## V. CONCLUSION

Finding no error by the district court, we affirm the judgment.

AFFIRMED.

HANNON, Judge, concurring in part, and in part dissenting.

I concur in the majority's opinion in all respects except its conclusion that the trial court did not err when it failed to instruct the jury on attempted second degree murder. When the evidence can support different and reasonable inferences, the jury must draw the inference determining the degree of criminal homicide. *State v. Archbold*, 217 Neb. 345, 350 N.W.2d 500 (1984). Under Neb. Rev. Stat. § 29-2027 (Reissue 1995), the court is required to instruct the jury on lesser-included offenses when there is evidence tending to show those crimes were committed. *State v. Archbold, supra*. I can see no reason why this same rule does not apply when the crime is attempted murder rather than the completed crime.

As defined in the majority's opinion, first degree murder is the purposeful, malicious, and premeditated killing of another person, whereas second degree murder is the malicious, intentional killing of another person. The elements of "purposeful," "malicious," "premeditation," and alternatively, "malicious intention" are necessarily proved by circumstantial evidence. By the nature of things, when a jury considers whether a defendant is guilty of first degree murder or the lesser-included offense of second degree murder, it is deciding whether the evidence established an inference of premeditation beyond a rea-

sonable doubt, as well as perhaps deciding the credibility of the evidence which might support either inference. The second step mentioned in *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993), that is, the court's determination whether the evidence presented at trial justifies an instruction on the lesser-included offense, has a different application when the element which distinguishes the greater crime from the lesser crime is one of intent, which is necessarily proved by inferences from the evidence.

I regard this situation as distinct from that in *State v. Tamburano*, 201 Neb. 703, 271 N.W.2d 472 (1978), where the defendant wanted an instruction on the lesser-included offense of second degree sexual assault rather than first degree sexual assault on the basis that there was no penetration. In *Tamburano*, the State introduced evidence establishing penetration, and the defendant did not dispute this evidence. In that case, the Supreme Court held that the lesser-included offense instruction was not proper because the prosecution had offered uncontroverted evidence of that element and the defendant had offered no evidence to dispute that fact. In *Tamburano*, the factor which distinguished the greater crime from the lesser crime was a physical fact, whereas in this case, the distinction between the crimes is necessarily in the mind of the defendant. I am therefore convinced that there is a rational basis to find that appellant intentionally and maliciously attempted to kill Brown, but did not do so with premeditation.

The difference in the nature of the elements requires a different treatment. Therefore, I believe the trial court was required to instruct the jury on attempted second degree murder, and I would reverse the conviction because it failed to do so.