STATE OF NEBRASKA, APPELLEE,
V. RUSSELL J. HIEMSTRA, APPELLANT.
579 N.W. 2d 550

Filed May 5, 1998. No. A-97-526.

David W. Jorgensen, of Nye, Hervert, Jorgensen & Watson, P.C., for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

HANNON, IRWIN, and MUES, Judges.

HANNON, Judge.

The appellant, Russell J. Hiemstra, was convicted following a jury trial in Buffalo County Court of driving under the influence (DUI) of an alcoholic liquor or drug. The county court sentenced Hiemstra to 6 months' probation, fined him $250, ordered him to pay court costs, suspended his driving privileges for 60 days, and ordered him to provide the court with written proof of his attendance at an alcohol education class and three Alcoholics Anonymous classes. Hiemstra appealed to the district court, which affirmed the county court's judgment of conviction. Hiemstra now appeals to this court, arguing that his constitutional rights were violated when his vehicle was stopped for speeding and that the trial court erred in admitting the results of his blood test and in instructing the jury as to the meaning of "driving under the influence." We conclude that the initial stop did not violate Hiemstra's constitutional rights and that Hiemstra was not prejudiced by the trial court's refusal to give his suggested jury instruction. However, we find that the trial court erred in admitting the blood test results. Therefore, we affirm the trial court's ruling denying Hiemstra's motion to suppress, but we reverse the conviction and remand the cause for a new trial.

## I. FACTUAL BACKGROUND

The following evidence was presented at the hearing on Hiemstra's motion to suppress. At approximately 1:10 a.m. on August 25, 1996, Officer Kevin Thompson, who testified he was trained to visually estimate speed, was patrolling the downtown Kearney, Nebraska, area when he visually observed Hiemstra's vehicle going too fast. Thompson then followed Hiemstra's vehicle, and Thompson's speedometer indicated Hiemstra was driving faster than 45 miles per hour. Thompson estimated that both his and Hiemstra's vehicles were traveling approximately 20 miles per hour over the speed limit.

Thompson testified that he stopped the vehicle and that when he first made contact with Hiemstra, he detected the odor of alcohol and saw beer cans throughout the vehicle as well as two

coolers. Thompson also noticed that Hiemstra's speech was slurred. Thompson gave the following testimony:

Q- When you first initiated the traffic stop and approached the vehicle, what did you say to the driver?

A- I asked him if he knew why he was being pulled over.

Q- And how did he respond?

A- He just said that he was being stupid.

Q- And did he say anything further?

A- And I asked him if — what he meant by that and he said because he was speeding.

Both Thompson and Hiemstra returned to the police car, where Hiemstra performed several sobriety tests. Hiemstra was instructed to repeat the letters of the alphabet. Thompson testified that Hiemstra did not commit any letter errors but that there were slurs in his speech. Hiemstra was then asked to count from 20 to 39 and then from 39 back down to 20. Thompson testified there were no numerical errors from 20 to 39, just slurs in Hiemstra's speech. When counting from 39 to 20, Hiemstra stopped at 25, asked Thompson if that was sufficient, and was told to continue as instructed.

Hiemstra was then instructed to stand and raise either foot approximately 3 to 6 inches off the ground and count from 1,001 to 1,030. Thompson told Hiemstra that after completing the test, he was to put his foot down and say "stop." Thompson testified that on his first attempt, Hiemstra put his foot down on the count of 3. On his second attempt, Hiemstra put his foot down on the count of 3, continued, and then put his foot down on the count of 9. On the third attempt, Hiemstra put his foot down on the count of 12. Finally, Hiemstra was instructed to perform the walk-and-turn sobriety test. Thompson testified that Hiemstra missed three heel-to-toe steps on the first set of nine, missed seven of the second set of nine, and did not count out loud as instructed.

Thompson testified that Hiemstra smelled of alcohol and that his eyes were bloodshot, his speech was slurred at times, and his balance and mental state were impaired. Thompson testified that based on his experience as an officer, his training in DUI investigations, and his personal experience with alcohol, he

believed that Hiemstra was an impaired driver when he was stopped.

Thompson arrested Hiemstra and drove him to the Good Samaritan Hospital for a blood test. Thompson testified that he read a *Miranda* form to Hiemstra and asked him if he understood his rights, and that Hiemstra then signed the form. The court received a document showing Thompson's signature as the witnessing officer and Hiemstra's signatures indicating that he both understood and waived his *Miranda* rights. Thompson testified he asked Hiemstra how much he had to drink and Hiemstra told him he drank four to five cans of beer. Thompson also testified that Hiemstra stated "[he had] been drinking for two hours from 10 o'clock until 11 o'clock [sic]" but then stated he had his last drink at 1 o'clock.

In his motion to suppress, Hiemstra alleged that all the evidence obtained should be suppressed because the initial stop violated the 4th, 5th, and 14th Amendments to the U.S. Constitution and article I, §§ 3 and 7, of the Nebraska Constitution. Hiemstra also moved the court to suppress any statements made while he was in custody but before the *Miranda* warnings were given. Hiemstra alleged that such statements violated his Fifth Amendment guarantee against self-incrimination. Finally, Hiemstra requested that the court suppress the results of the blood test because Thompson did not have probable cause to request the test. The court overruled Hiemstra's motion.

At trial, Thompson testified to essentially the same version of the facts as during the hearing on the motion to suppress. Thompson stated that Hiemstra was under the influence when he was arrested. Thompson testified that after arresting Hiemstra, Thompson read him a postarrest chemical advisement form, which Hiemstra signed.

The court received a "Post Arrest Chemical Test Advisement" form signed by Thompson which was marked to read, "I hereby direct a test of your X blood _ breath X urine to determine the X alcohol _ drug content." Thompson testified he did not give Hiemstra a urine test or the opportunity to take a urine test. Outside the presence of the jury, Hiemstra's attorney claimed that Thompson's marks directing both a urine and a blood test were inconsistent with Nebraska statutes and asked the court to

suppress any testimony regarding the blood test. The court denied this request.

Thompson explained why he did not give Hiemstra a speeding citation: "The main reason is because I didn't have a radar lock on the defendant in this case and the second reason for not giving him a ticket is he's already — he already has a DUI pending. I didn't feel the need to hammer the guy."

Tyler Schwartz, a medical technologist employed by Good Samaritan Hospital, testified that he did not recall drawing blood from Hiemstra on August 25, 1996. However, the court received a document identified by Schwartz as a "Legal Alcohol on Body Fluid" form. Schwartz testified he signed and dated the document and wrote down a time. "Russell J. Hiemstra" is listed on the document as the "Subject Name," and the document shows that blood was obtained by Schwartz at "0150" on August 25. Additional facts regarding Schwartz' testimony will be discussed later in this opinion.

Diane Stevens, a medical technologist employed by Good Samaritan Hospital, testified that she tests blood for legal blood alcohol content using a machine called the Abbott TDx. The court received Stevens' Class A permit, which allows her to perform testing for body fluid alcohol content. Stevens testified, over objection, that Hiemstra's body fluid alcohol content was .18 of 1 gram per 100 milliliters. Additional facts regarding the blood test will be discussed later in this opinion.

Hiemstra's motions to dismiss or, in the alternative, for a directed verdict at the conclusion of the State's evidence and at the conclusion of Hiemstra's evidence were denied. Hiemstra was convicted of DUI, and he appealed to the district court. The district court for Buffalo County affirmed the trial court's judgment of conviction.

## II. ASSIGNMENTS OF ERROR

Hiemstra claims the trial court erred (1) in failing to find that the stop of his vehicle violated the 4th and 14th Amendments to the U.S. Constitution and article I, §§ 3 and 7, of the Nebraska Constitution; (2) in receiving the blood test results even though the person drawing the blood was not qualified; (3) in receiving the blood test results even though the arresting officer did not

provide Hiemstra a urine test; (4) in receiving the blood test results even though the person testing his blood did not conform to title 177 (177 Neb. Admin. Code, ch. 1, § 006.04D (1990)) requirements; and (5) in instructing the jury as to the definition of "driving under the influence."

### III. STANDARD OF REVIEW

■ In reviewing a criminal conviction, it is not the province of the appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Woods*, 249 Neb. 138, 542 N.W.2d 410 (1996).

■ With regard to questions of law, an appellate court is obligated to reach a conclusion independent of the decision reached by the trial court. *State v. Champoux*, 252 Neb. 769, 566 N.W.2d 763 (1997).

### IV. ANALYSIS

#### 1. Vehicle Stop

■ Hiemstra claims the trial court erred in overruling his motion to suppress. Specifically, Hiemstra contends the trial court erred in failing to find that the stop of his vehicle violated his constitutional rights. Regarding motions to suppress, the Nebraska Supreme Court has recently held that "ultimate determinations of reasonable suspicion and probable cause are reviewed de novo and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge." *State v. McCleery*, 251 Neb. 940, 942, 560 N.W.2d 789, 790 (1997). In reviewing the trial court's ruling on a motion to suppress, an appellate court considers all the evidence from the trial as well as from the hearing on the motion. *State v. Case*, 4 Neb. App. 885, 553 N.W.2d 173 (1996).

■ The test to determine if an investigative stop was justified is whether the police officer had a reasonable suspicion, based on articulable facts, which indicated that a crime had occurred, was occurring, or was about to occur and that the sus-

pect might be involved. See, *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996); *State v. Smith*, 4 Neb. App. 219, 540 N.W.2d 374 (1995). In addition, " '[w]hen an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.' " *State v. Chronister*, 3 Neb. App. 281, 285, 526 N.W.2d 98, 103 (1995), quoting *U.S. v. Cummins*, 920 F.2d 498 (8th Cir. 1990), *cert. denied* 502 U.S. 962, 112 S. Ct. 428, 116 L. Ed. 2d 448 (1991).

Hiemstra argues that "[a]t no time was there ever any evidence offered to show whether or not Hiemstra was in fact exceeding any speed limit or violating any law." Brief for appellant at 12. Thompson's stop was based on his visual observation that Hiemstra was traveling in excess of the speed limit. Thompson testified that the speed limit in the area ranged from 20 to 25 miles per hour. Thompson stated that when following Hiemstra, he was driving in excess of 45 miles per hour. As such, Thompson had probable cause to stop Hiemstra because Hiemstra was violating the speed limit.

Hiemstra also argues that "no testimony was offered to show that Thompson's estimation was corroborated with mechanical, electronic or radio microwave devices." Brief for appellant at 13. This argument is similar to that used in *State v. Howard*, 253 Neb. 523, 571 N.W.2d 308 (1997). In *Howard*, the defendant argued the officer's testimony that the defendant was driving over 100 miles per hour had to be corroborated by a radio microwave, mechanical, or electronic speed measurement device in accordance with Neb. Rev. Stat. § 60-6,192 (Reissue 1993). Section 60-6,192 states:

> Determinations made regarding the speed of any motor vehicle based upon the visual observation of any peace officer, while being competent evidence for all other purposes, shall be corroborated by the use of a radio microwave, mechanical, or electronic speed measurement device. The results of such radio microwave, mechanical, or electronic speed measurement device may be accepted as competent evidence of the speed of such motor vehicle in any court or legal proceeding when the *speed* of the vehicle *is at issue*.

(Emphasis supplied.) The court held that when testimony regarding speed is used to establish some charge other than

speeding, the officer's testimony need not be corroborated. *State v. Howard, supra.*

As in *Howard,* the actual speed of Hiemstra's vehicle is not at issue. Hiemstra was not charged with speeding. Thompson's estimate was used to establish that he had probable cause for stopping Hiemstra. Hiemstra's first assignment of error is without merit.

### 2. INADMISSIBILITY OF BLOOD TEST RESULTS

Hiemstra argues the trial court erred in admitting his blood test results for three reasons. First, the person who drew Hiemstra's blood was not qualified under Neb. Rev. Stat. § 60-6,201 (Reissue 1993). Second, the arresting officer failed to provide Hiemstra a urine test. Third, the State failed to show the requirements of title 177 (177 Neb. Admin. Code, ch. 1, § 006.04D (1990)) were complied with. We will address each argument in turn.

#### (a) Qualifications of Person Drawing Blood

Hiemstra argues the trial court erred in receiving Hiemstra's blood test results because the person drawing Hiemstra's blood was not qualified. The drawing of blood and the admissibility of test results are controlled by § 60-6,201, which provides in pertinent part:

> (3) To be considered valid, tests of blood . . . shall be performed according to methods approved by the Department of Health and by an individual possessing a valid permit issued by such department for such purpose, *except that a physician, registered nurse, or other trained person employed by a licensed institution or facility which is defined in section 71-2017.01* . . . may withdraw blood for the purpose of a test to determine the alcohol concentration . . . .

(Emphasis supplied.)

In the instant case, Schwartz drew Hiemstra's blood and had no valid permit to do so. Schwartz was asked the following questions: "Q- And to the best of your knowledge, is Good Samaritan Hospital a certified hospital? A- Yes. . . . Q- Do you know if the State of Nebraska requires a certification or permit for one who draws blood? A- I don't know."

Pursuant to Neb. Evid. R. 602, a witness may not testify to something of which the witness has no personal knowledge. See, Neb. Rev. Stat. § 27-602 (Reissue 1995); *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997); *Sedlak Aerial Spray v. Miller*, 251 Neb. 45, 555 N.W.2d 32 (1996). Schwartz' testimony did not evidence that he possessed personal knowledge that Good Samaritan Hospital was or was not a certified hospital or that he even knew the significance of "certified." Indeed, the question was framed so that Schwartz could answer in the affirmative even if he did not know whether the hospital was licensed. As such, Schwartz' statements did not demonstrate that Good Samaritan Hospital is a licensed institution or facility as required by § 60-6,201(3).

We also note that on September 15, 1997, the State filed a "Suggestion of Remand" stating that remand to the district court for a new trial was appropriate because "the State failed to present evidence that the person drawing Hiemstra's blood was employed by a 'licensed institution or facility' as required by Neb. Rev. Stat. § 60-6,201(3) (1993)." Nonetheless, in its brief, the State argued that Hiemstra's failure "to object to Schwartz' testimony that Schwartz had drawn a blood sample from Hiemstra" was "a waiver of his right to now raise the issue on appeal." Brief for appellee at 10-11.

The argument in the State's brief is without merit. The State argues Hiemstra needed to object when Schwartz testified that he drew Hiemstra's blood. The evidence shows that Schwartz did, in fact, draw a blood sample from Hiemstra; thus, an objection at that time was unwarranted. Instead, Hiemstra objected on the basis of insufficient foundation when the blood test results were offered. Hiemstra's objection was timely.

Based on the evidence, the trial court erred in admitting the results of Hiemstra's blood test because the State failed to show that a qualified person, pursuant to § 60-6,201, drew Hiemstra's blood.

### (b) Failure to Provide Urine Test

The court received a "Post Arrest Chemical Test Advisement" form which had "Russell J. Hiemstra" listed at the top. Thompson testified, and the evidence shows that he placed checkmarks on the form, causing it to read, "I hereby direct a

test of your X blood [and] X urine to determine the X alcohol . . . content." The form was signed by Thompson as the "Advising Officer" and was also signed by Hiemstra. Only Hiemstra's blood was tested. Hiemstra argues:

> Section 60-6,199 Neb. R.R.S. generally provides that an arrested person, when advised that they will have a chemical test of their blood, breath or urine test performed, may *request* a second test, and if the second test is not provided then the first test would be inadmissible. . . . Because of the failure of the arresting officer to *provide* the second test, the first test should not have been received as evidence.

(Emphasis supplied.) Brief for appellant at 23.

 Hiemstra notes the statute states an arrested person may *request* a second test. See Neb. Rev. Stat. § 60-6,199 (Reissue 1993). Hiemstra then argues the blood test is inadmissible because a second test was not *provided*. There is no evidence Hiemstra requested a urine test. The Supreme Court has stated that "while . . . the police cannot hamper a motorist's efforts to obtain independent testing, they are under no duty to assist in obtaining such testing beyond allowing telephone calls to secure the test." *State v. Dake*, 247 Neb. 579, 584, 529 N.W.2d 46, 49 (1995). Therefore, Thompson had no duty to *provide* a urine test for Hiemstra. In addition, the fact that no urine test was performed does not affect the admissibility of the blood test, and Hiemstra provides us with no law to the contrary. There is no evidence this error misled Hiemstra to his prejudice or somehow caused him to not request a urine test. Hiemstra's third assignment of error is without merit.

### (c) Failure to Show Abbott TDx Was Working as Required by Title 177

Hiemstra argues the trial court erroneously admitted the blood test results because the requirements of title 177 (177 Neb. Admin. Code, ch. 1, § 006.04D (1990)) were not satisfied. Specifically, Hiemstra argues that "[t]he use of a known substance to obtain a low, medium and high control and the use of refrigerated reagent packs" are required by title 177. Brief for appellant at 28. Title 177 was entered into evidence and lists the following requirements under the heading "Radiative Energy Attenuation Utilizing The Abbott TDx Analyzer:"

006.04D1 The radiative energy attenuation method . . . must be performed in a manner to include at least the following technique:

. . . .

006.04D1g Also upon completion of analysis, remove the carousel and discard its contents. If the reagent pack is not to be used immediately again, remove and store it at 2 to 8 degrees C.

. . . .

006.04D1j Each test run shall include a low, medium, and high control. If runs contain more than twelve specimens, the controls shall be placed after the last specimens for a chemical test on the carousel.

Hiemstra's argument is twofold. First, the State failed to prove the reagent pack was properly refrigerated. Second, the State failed to identify or verify the contents of the control used to demonstrate the Abbott TDx was working properly.

Stevens testified generally that she followed all of the policies and procedures of title 177. Such general testimony is a conclusion and is insufficient to show that title 177 requirements were complied with. Specifically, the State failed to question Stevens about the refrigeration of the reagent pack. Therefore, the State failed to prove that title 177 was complied with, and the trial court erred in admitting the blood test results.

Hiemstra also contends his blood test results were erroneously admitted because the State failed to verify the contents of the control used to demonstrate the Abbott TDx was working properly. Hiemstra's argument is very similar to that in *State v. Gerber*, 206 Neb. 75, 291 N.W.2d 403 (1980), *overruled on other grounds, State v. Obermier*, 241 Neb. 802, 490 N.W.2d 693 (1992). In *Gerber*, the defendant was convicted of driving under the influence and claimed the lower court erred in admitting the results of his Breathalyzer test. The officer who administered the test testified that an ampul containing an amount of ethyl alcohol, referred to as a " 'NALCO standard,' " *id.* at 79, 291 N.W.2d at 406, is used to determine if the machine is operating correctly. (An ampule, ampul, or ampoule is "a sealed glass or plastic bulb containing solutions for hypodermic injection." Webster's Encyclopedic Unabridged Dictionary of the

English Language 51 (1989).) The NALCO standard is attached to the machine, and if operating correctly, the machine registers a number that matches the number on the ampul. The officer conceded that determining whether the machine is working depends on whether the alcohol content of the NALCO standard is, in fact, as reflected on the ampul.

The officer in *Gerber* testified that he did not know who prepared the NALCO standard and did not know where the NALCO standard came from or its actual alcohol content. The officer admitted he did not know if the machine was operating correctly at the time the defendant was tested. The *Gerber* court held that a competent witness must establish where the NALCO calibration standard used to determine if a Breathalyzer machine is operating correctly came from, how it was received, under what conditions it was kept and preserved, and what spot checks were made to determine its validity. The court quoted the following statement with approval:

> "The fact that the *sealed* ampoules are delivered by the manufacturer of the breathalyzer machine for exclusive use in such machine plus the additional fact of regular spot checking of the ampoules is, in our opinion, sufficient *prima facie* proof that the chemicals in any one ampoule are of the proper kind and mixed to the proper proportion."

(Emphasis in original.) 206 Neb. at 90, 291 N.W.2d at 411 (quoting *State v. Baker*, 56 Wash. 2d 846, 355 P.2d 806 (1960)). The *Gerber* court held the test inadmissible because the State failed to prove the necessary requirements were met.

In the instant case, Stevens testified that a known substance, called a control, is very important in determining whether the machine is working properly. Stevens testified that she receives a known substance, in a vial or a tube, from a manufacturer. Included with the substance is a certificate from the manufacturer stating the bottle contains a certain amount of ethanol. The bill of exceptions contains the following testimony:

> Q- . . . You get this known substance and my only question is, before you use it in the machine, what do you do to make sure that the known substance is what it purports to be?

A- Okay, the known substance has a known value on it. So I run it and if I get the known value on it, I assume that it's what it's supposed to be because I got the value they told me I would get.

Q- And that's based not upon your test, but what some piece of paper says?

A- They ran it and got this answer, I rerun it, get the same answer.

Stevens also testified that Good Samaritan Hospital did not have a policy or procedure of periodically testing blood kits to make sure that the contents of the test tubes were what they purported to be.

Based on *Gerber, supra*, we find that the trial court erred in admitting the results of Hiemstra's blood test because there was no testimony or evidence identifying the contents of the control, showing how the control was received, detailing under what conditions the control was kept and preserved, and identifying what spot checks were made to determine the validity of the control.

### 3. JURY INSTRUCTIONS

Hiemstra argues that "the definition of under the influence as given by the Court is not appropriate and is an incorrect statement of the law. The problem with the Court's instruction is that it causes the jury to try to guess at what Hiemstra's normal body or mental faculties would be." Brief for appellant at 29. Over objection, the trial court gave the following instruction defining "under the influence":

A person is under the influence of alcoholic liquor if such person is impaired because of his or her[]consumption of alcohol in the capacity to think and act correctly and efficiently, to the extent as to have lost an appreciable degree of the normal control of his or her body or mental faculties.

Hiemstra proposed the following instruction: "The phrase 'under the influence of alcoholic liquor' means the ingestion of alcohol in an amount sufficient to impair to any appreciable degree the ability to operate a motor vehicle in a prudent and cautious manner."

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law; (2) the tendered instruction is warranted by the evidence; and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990). In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996); *State v. Ryan*, 249 Neb. 218, 543 N.W.2d 128 (1996).

The language of Hiemstra's proposed jury instruction is very similar to that of NJI2d Civ. 7.52. We conclude that Hiemstra's proposed instruction is a correct statement of the law and note that the court's instruction seems to require evidence of the individual defendant's "normal control of his or her body," whereas the NJI2d Civ. 7.52 instruction does not contain this weakness. Hiemstra also satisfies the second requirement that the instruction must be warranted by the evidence. Since Hiemstra was charged with "driving under the influence," a jury instruction defining that term was certainly warranted. However, Hiemstra fails to establish that his rights were prejudiced by the court's failure to give the suggested jury instruction. We assume that Hiemstra is arguing his rights were prejudiced because the given jury instruction is an incorrect statement of the law. We recognize that the given jury instruction contains the weakness cited above and is therefore somewhat confusing, while the language of NJI2d Civ. 7.52 is considerably clearer. However, the Supreme Court has stated that jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is no prejudicial error. *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995).

We must examine the jury instructions in their entirety. Jury instruction No. 4 generally explains the material elements of driving under the influence; specifically, that the defendant was in actual physical control of a motor vehicle while under the influence of alcohol or while having a concentration of .10 of 1

gram or more of alcohol per 100 milliliters of his blood. Jury instruction No. 5 explains that Neb. Rev. Stat. § 60-6,196 (Reissue 1993) makes it unlawful for any person to operate or be in actual physical control of a motor vehicle while under the influence of alcohol or while having a concentration of .10 of 1 gram of alcohol or more per 100 milliliters of his or her blood.

When read in their entirety, the jury instructions accurately and fairly present the law of DUI. Therefore, Hiemstra has failed to meet his burden and to demonstrate that his rights were prejudiced by the court's failure to give the suggested jury instruction. Hiemstra's final assignment of error is without merit. However, upon remand, we remind the trial court that as long as there is a Nebraska jury instruction that accurately states the law and applies to the case, it is the instruction which should be given. *State v. Jimenez*, 3 Neb. App. 421, 530 N.W.2d 257 (1995), *aff'd as modified* 248 Neb. 255, 533 N.W.2d 913.

### 4. EFFECT OF ERRORS

Hiemstra urges that the admission of the blood test results necessitates the dismissal of his case. However, in *State v. Hingst*, 251 Neb. 535, 557 N.W.2d 681 (1997), the Supreme Court reached a different conclusion in a factually similar case. In *Hingst*, the defendant was also convicted of DUI. On appeal, the court held that the trial court committed plain error when it failed to exclude the chemical test results because the defendant was not properly advised before the test was taken. However, the State argued that the record contained other evidence sufficient to sustain the conviction. On further review, the Supreme Court stated, "In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt." *Id.* at 537, 557 N.W.2d at 683. "An error is harmless when the improper admission of evidence did not materially influence the jury to reach a verdict adverse to the substantial rights of the defendant." *Id.* at 538, 557 N.W.2d at 683.

The Supreme Court noted the record contained evidence that at the time of arrest, the defendant's eyes were bloodshot, he smelled of alcohol, his speech was slurred, and he failed twice to correctly recite the alphabet. However, the Supreme

Court was unable to determine which evidence the jury relied on in convicting the defendant. The Supreme Court held that after a jury trial where prejudicial evidence was erroneously admitted, if sufficient evidence exists to support the conviction, the cause may be remanded for further proceedings, but if the evidence is not sufficient, the cause must be dismissed. The Supreme Court found that sufficient evidence existed upon which a jury could, on remand, find the defendant guilty of DUI; accordingly, the Supreme Court affirmed this court's decision reversing the conviction and remanding the cause for a new trial.

## V. CONCLUSION

As in *Hingst*, in this case, the trial court erred in admitting Hiemstra's blood test results, as determined above. We cannot say that this error was harmless beyond a reasonable doubt. However, the record contains independent evidence to support Hiemstra's conviction. Thompson's testimony establishes that Hiemstra was driving under the influence. Thus, we find that there is sufficient evidence to support the conviction. Accordingly, we affirm the trial court's ruling denying Hiemstra's motion to suppress, but we reverse the judgment of conviction and remand the cause for a new trial.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.