STATE OF NEBRASKA, APPELLEE, V.
DANIEL L. OWENS, APPELLANT.
589 N.W. 2d 867

Filed February 2, 1999.   No. A-98-080.

James Walter Crampton for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

MUES and INBODY, Judges, and BUCKLEY, District Judge, Retired.

INBODY, Judge.

## I. INTRODUCTION

Daniel L. Owens appeals his convictions for second degree murder, unlawful discharge of a firearm at an occupied vehicle, and use of a firearm to commit a felony. On appeal, Owens contends that the trial court's preliminary instructions to the jury

and the self-defense instruction were erroneous. He further contends that he was denied a fair trial because the trial court erroneously excluded testimony regarding a prior inconsistent statement by one of the State's witnesses and refused defense counsel the opportunity to explore Owens' state of mind regarding his claim of self-defense and alternatives to his act of force. For the reasons set forth herein, we reverse, and remand for a new trial.

## II. STATEMENT OF FACTS

We review the evidence in the light most favorable to the State. *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

Around 8 p.m. on June 18, 1997, Karen Zarp, her brother Jason Zarp, his friend Jeremy Jesionowicz, and Karen's boyfriend Joel Kudym were riding in the Zarps' 1991 Jeep Cherokee, returning to Springfield, Nebraska, after having gone to the Dairy Cream in Louisville, Nebraska, for "Slushies." On the way home, Kudym was driving, Karen was in the front passenger's seat, Jason was seated behind Karen, and Jesionowicz was seated behind Kudym. While the foursome was traveling toward Springfield, they encountered a 1989 blue Ford Escort, license plate No. 20-J777, in front of them, from which the male passenger was firing bottle rockets out of the window. Several of the bottle rockets hit the ground and ricocheted back toward the Jeep. Karen called 911 to report the situation. The operator gave Karen the telephone number for the Sarpy County sheriff's office, which Karen then called and repeated the report of bottle rockets being fired from the Escort. At this time, the vehicles were south of Springfield, traveling north on Highway 50. Karen stated that the Sarpy County dispatcher told her to stay behind the Escort, so the Jeep stayed behind the Escort. However, the Jeep never got close enough to bump, or otherwise touch, the Escort.

At a stoplight at the intersection of Interstate 80 and Highway 50 in Sarpy County, the Jeep pulled up in the right lane alongside the Escort, which was in the left lane. While the two vehicles were side by side at the stoplight, no one in the Jeep made any gestures toward the occupants of the Escort, nor did any of the occupants of the Jeep try to get out of that vehi-

cle, and no words were exchanged between the occupants of the two vehicles. However, the male passenger in the Escort, who was wearing red clothes and a red hat, pulled out a gun, firing it three or four times at the Jeep. Jesionowicz pulled Jason down after the first shot, which shattered the Jeep's driver's-side rear cargo window and hit the spare tire in the cargo area of the Jeep. The second shot hit the front passenger's-door panel directly behind Karen, who had ducked. The last shot shattered the driver's side window and hit Kudym in the left side of the head, just above his left ear. Kudym later died of his injury.

After Kudym was struck by the bullet, his foot remained on the gas pedal, and the Jeep jolted forward. Jesionowicz, who was seated behind Kudym, reached forward and grabbed the steering wheel. Karen pulled Kudym's foot off of the gas pedal and used the emergency brake to slow the Jeep down. The Jeep came to rest in front of Omaha Auto Auction on an access road about three blocks north of the I-80 and Highway 50 interchange.

Shortly after 10 p.m. on June 18, 1997, Zeb Simones, of the Cass County sheriff's office, was dispatched to look for a blue Ford Escort. Simones was able to determine that the vehicle was registered to an individual residing in Cedar Creek, Cass County, Nebraska, so he headed to Cedar Creek to look for the Escort. Simones did stop the Escort, which was being driven by a female, Jennifer Jaderborg, and had a male passenger, Owens, who was wearing a red shirt or jacket and baggy blue jeans and had a goatee. Both individuals were taken into custody, and a search of the vehicle was made. Officers found a piece of white PVC pipe wrapped in electrical tape in the vehicle.

Later, officers conducted a more thorough search of the vehicle pursuant to a warrant. During this search, officers located a red baseball cap on the floor by the passenger's seat, bottle rockets on the back seat floor behind the driver's seat, a box of ammunition underneath the passenger's seat, and a loaded 9-mm Hungarian 380 semiautomatic handgun hidden between the back top seat cushion and the back bottom seat cushion of the Escort.

Jaderborg was taken to the Sarpy County sheriff's office. Owens was taken to the Sarpy County Law Enforcement Center. During transport, Owens asked Lt. John Kucer, of the Sarpy

County Sheriff's Department, "what was this about?" Kucer explained the details of the incident to Owens, who then said, "I guess I am supposed to have shot somebody."

Early in the morning hours of June 19, 1997, Deputy Sheriff Kathe Erhart, an investigator with the Sarpy County Sheriff's Department, interviewed Owens at the law enforcement center. During this interview, which apparently was conducted after Owens had been advised of his *Miranda* rights, Owens stated that the occupants of the Jeep had been waving their arms and yelling threats at him, but he could not state what those threats were. Additionally, Owens stated that he thought the rear passenger's door was being opened and that "he felt threatened so he shot them." When asked why he had placed the gun underneath the back seat of the Escort, Owens responded that "he hid the gun because he shot it."

On July 22, 1997, an information was filed in Sarpy County District Court charging Owens with second degree murder, shooting at an occupied structure or vehicle, and use of a firearm to commit a felony. A jury trial was held on November 3, 4, and 5, 1997. The State presented evidence as previously set forth in this statement of facts, in addition to the following evidence:

Dr. Blaine Roffman testified that an autopsy was performed on Kudym on June 19, 1997, and that the cause of Kudym's death was a gunshot wound to the head resulting in brain damage and brain hemorrhage. During the autopsy, Dr. Roffman removed the bullet slug that had killed Kudym.

Sgt. Mark Bohaty of the Nebraska State Patrol Criminalistics Laboratory testified that he examined the 9-mm Hungarian 380 semiautomatic handgun for the Sarpy County sheriff's office to compare the firearm to the fired bullets. Bohaty performed a microscopic analysis of the bullet that was recovered during the autopsy of Kudym in comparison to a bullet test-fired from the handgun seized from the Escort, concluding that the bullet that killed Kudym was fired by the pistol. Bohaty also tested a slug found at the crime scene behind the passenger's front tire of the Jeep and concluded that the slug was also fired by the handgun.

During the State's case in chief, Jaderborg testified that Owens said to her, " 'I think I saw some glass break. I hope I

shot someone.'" On cross-examination, defense counsel asked Jaderborg if she, in her statement to police, stated that Owens said to her that "I hope I hit somebody." Jaderborg admitted that such a statement was not included in her statement to police.

After the State concluded its case in chief, Owens moved for dismissal for failure to state a prima facie case, which motion was overruled. Owens then presented his defense.

One of the witnesses called by the defense was Laura Carey, Owens' mother. Defense counsel sought to obtain testimony, over the State's objection, from Carey concerning a prior inconsistent statement allegedly made by Jaderborg for the purpose of impeaching Jaderborg's testimony. The trial court sustained the State's objection to this testimony.

The final trial witness was Owens himself. He testified that one of the passengers in the back of the Jeep was throwing his hands up in what Owens believed were gang signs and was yelling at him. He further testified that the other occupants in the Jeep were "looking at [him] mean." Then, Owens claimed that it looked like one of the passengers in the back seat was reaching under the seat to get a weapon or to open the door. However, during cross-examination when Owens was asked what he was shooting at when he fired the second shot, Owens stated, "I was trying to shoot toward the front of the vehicle, but I was a little shaky and couldn't see." The prosecutor asked, "Couldn't see what?" Owens responded, "Couldn't see too much of anything without my glasses."

On November 5, 1997, the jury found Owens guilty of second degree murder, discharging a firearm at an occupied vehicle, and use of a firearm to commit a felony. On November 14, Owens filed a motion for new trial, which was denied on December 19. Owens was sentenced to 40 years' imprisonment on the second degree murder conviction, 10 years' imprisonment on the discharging a firearm at an occupied vehicle conviction, and 15 years' imprisonment on the use of a firearm to commit a felony conviction. The sentences for second degree murder and discharging a firearm at an occupied vehicle were ordered to run concurrently. The use of a firearm conviction was ordered to run consecutively to the other convictions. Owens then timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

On appeal, Owens contends that the trial court's preliminary instructions to the jury and the jury instruction regarding Owens' claim of self-defense were erroneous. He further contends that he was denied a fair trial because the trial court erroneously excluded testimony regarding an alleged prior inconsistent statement by Jaderborg and refused defense counsel the opportunity to explore Owens' state of mind regarding his claim of self-defense and alternatives to his act of force.

## IV. DISCUSSION

### 1. PRELIMINARY JURY INSTRUCTIONS

Owens' first assignment of error is that the trial court gave erroneous jury instructions. The preliminary jury instruction to which Owens objects, in pertinent part, was the court's advisement to the jury:

> You should not pay any attention to news reports that may be made regarding the case. I am comfortable with the twelve of you folks that you could read a news article and it wouldn't influence you one way or the other. I would almost tell you to save the papers and after the case is over read the news articles or have somebody tape it and listen because you may not recognize the case in the news article that you read. So stay away from any of the media reports on it during the next couple of days or until the case is [submitted] for your deliberation. . . .

Owens contends that the preliminary instruction somehow might have misled the jury members into believing that they could review media reports after the case was submitted to the jury, but before the verdict was reached, and that this denied him a fair trial.

Jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is no prejudicial error. *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995); *State v. Hiemstra*, 6 Neb. App. 940, 579 N.W.2d 550 (1998).

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a

substantial right of the appellant. *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996); *State v. Woods*, 249 Neb. 138, 542 N.W.2d 410 (1996); *State v. Derry*, 248 Neb. 260, 534 N.W.2d 302 (1995).

At the beginning of these preliminary instructions, the judge stated:

> Before we go any further I want to make a few remarks about what we are going to do. Near the end of the trial I will give you detailed instructions that explain the rules of law in the case, and what I say now is not a substitute for those more detailed instructions, but only an introduction to the trial.

Additionally, at the close of the trial, the court instructed the jury pursuant to instruction No. 10 that "[a]nything you may have seen or heard about this case outside the courtroom" is not evidence. It is clear that when the jury instructions in the instant case are read in their entirety, they fairly present the law and are not misleading, and that Owens cannot show any prejudice resulting from the complained of instruction.

Furthermore, even if the tendered instructions had been misleading, it is clear that Owens could not have suffered any prejudice therefrom. The instant case was submitted to the jury at 12:20 p.m. on November 5, 1997, and the jury returned its verdict before 5:21 p.m. that same day, which was the time that the jury verdict form was file stamped by the clerk of the Sarpy County District Court. Thus, the jury had no opportunity to consult outside media reports from the time the case was submitted until the verdict was reached.

In sum, the tendered jury instructions fairly presented the law and were not misleading, and Owens did not show any prejudice resulting from the complained of instruction. Therefore, this assignment of error is without merit.

## 2. SELF-DEFENSE INSTRUCTION

Owens' second assignment of error is that jury instruction No. 9, regarding self-defense, was erroneous because it instructed the jury that Owens' claim of self-defense could not have been based upon the possibility of a threat from the other occupants of the Jeep, but could only have been based upon a threat from the victim, Kudym.

■ To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997); *Kent v. Crocker*, 252 Neb. 462, 562 N.W.2d 833 (1997); *State v. Glantz*, 251 Neb. 947, 560 N.W.2d 783 (1997).

■ Justifications for the use of force are statutorily defined affirmative defenses. *State v. Kinser, supra*. See Neb. Rev. Stat. § 28-1416(1) (Reissue 1995). In pertinent part, Neb. Rev. Stat. § 28-1409 (Reissue 1995), Nebraska's use of force in self-protection statute, provides:

(1) . . . [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

. . . .

(4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death [or] serious bodily harm . . . nor is it justifiable if:

(a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . .

Neb. Rev. Stat. § 28-1406(3) (Reissue 1995) defines "[d]eadly force" in part as

force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force.

In the instant case, jury instruction No. 9 provided:

The defendant acted in self defense if:

(1) Joel Kudym threatened death or serious bodily harm; and

(2) The defendant did not provoke any such threat of death or serious bodily harm against him with the intent of using deadly force in response; and

(3) Under the circumstances as they existed at the time, the defendant reasonably believed that his use of deadly force was immediately necessary to protect him against death or serious bodily harm; and

(4) Before using deadly force, the defendant either tried to get away or did not try because he reasonably did not believe he could do so in complete safety.

The fact that the defendant may have been wrong in estimating the dahger does not matter so long as there was a reasonable basis for what he believed and he acted reasonably in response to that belief.

Instruction No. 9 is clearly taken from NJI2d Crim. 7.3, "Self Defense (Deadly Force)," which provides:

The defendant acted in self defense if:

(1) (here insert victim's name) (here insert appropriate language such as threatened, attempted, caused, threatened or caused) (death, serious bodily harm, kidnapping, sexual intercourse compelled by force or threat of force); and

(2) the defendant did not provoke any such (use of force) against (him, her) with the intent of (using deadly force) in response; and

(3) under the circumstances as they existed at the time, the defendant reasonably believed that (his, her) (use of deadly force) was immediately necessary to protect (him, her) against (death, serious bodily harm, kidnapping, sexual intercourse compelled by force or threat of force)[; and

(4) before (using deadly force) the defendant either tried to get·away or did not try because (he, she) reasonably did not believe (he, she) could do so in complete safety].

The fact that the defendant may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what (he, she) believed and (he, she) acted reasonably in response to that belief.

■ Although a trial court generally retains discretion in the wording of jury instructions, whenever an instruction from the Nebraska Jury Instructions is applicable and, from a consideration of the facts and prevailing law, the trial court determines that an instruction on a particular subject is appropriate, the instruction in the Jury Instructions should be used. *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992). See, also, *State v. Stueben*, 240 Neb. 170, 481 N.W.2d 178 (1992); *State v. Dush*, 214 Neb. 51, 332 N.W.2d 679 (1983). A rule adopted in 1989 by the Supreme Court regarding Nebraska Jury Instructions, which was amended in 1996, provides in pertinent part:

> Nebraska Jury Instructions, Second Edition (NJI2d), is designed for use when the instruction correctly states the law and the pleadings and evidence calls for such an instruction. Where applicable, a trial judge may utilize an appropriate NJI instruction.
>
> . . . .
>
> The rule of practice adopted by [the Nebraska Supreme Court] on November 20, 1968, requiring use of the Nebraska Jury Instructions is hereby rescinded.

NJI2d at xxxix. Thus, if the self-defense jury instruction correctly stated the law, the trial court did not err in utilizing the Nebraska Jury Instructions. We proceed to consider whether the jury instructions were a correct statement of the law, as applicable to the facts in the instant case.

In *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981), the Nebraska Supreme Court considered the defendant's claim that the self-defense instruction given by the trial court, which followed the Nebraska Jury Instructions, was incorrect under the circumstances of that case.

In *State v. Duis, supra*, Duis, accompanied by a friend, drove his car to an Arby's, went inside to place an order for food, picked up the order, and went back out to his car. In the meantime, David Moss drove his car to the same Arby's. Moss was accompanied by the victim, Allan Ray Veasley. Moss and Veasley also went inside and ordered some food. At some point, name calling ensued between the parties. Moss walked back to his car and "made motions as if to take something out of the

back seat and lay it up on top of the hood of the car as if it were a gun." *State v. Duis*, 207 Neb. at 853, 301 N.W.2d at 589. Duis and his friend got into Duis' car and started to leave the parking lot. However, Duis saw where Moss was standing and thought that Moss had a weapon in his hand. While driving forward, Duis reached under his seat, picked up a .32-caliber handgun, and with his right hand fired three shots behind him in the direction of Moss' car, striking Veasley in the thigh. At trial, Duis claimed self-defense, and the jury was instructed on that theory. However, the jury convicted Duis of second degree assault.

One of Duis' claims on appeal was that the self-defense instruction given to the jury was incorrect under the circumstances of the case. In its consideration of Duis' appeal, the Nebraska Supreme Court stated:

> Although never specifically pointed out to the trial court, it is apparent that the language . . . claimed by the defendant to have been unclear is the following: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such person on the present occasion." *Undoubtedly, it would have been more precise had the instruction explained to the jury that if the defendant was justified in using force toward Moss, he was justified in the force employed, which mistakenly struck the actual victim.* Mayweather v. State, 29 Ariz. 460, 242 P. 864 (1926).

(Emphasis supplied.) *State v. Duis*, 207 Neb. at 856, 301 N.W.2d at 590. However, the court held that because the instruction given by the trial court was a correct statement of the law and Duis never proposed an alternate instruction, no error occurred.

■ The distinction between *State v. Duis, supra,* and the instant case is that, in *Duis,* although a more precise instruction could have been given to the jury, the instruction that was given was legally correct. However, in the instant case, the jury was specifically instructed that the threat of force could only have come from the victim. According to *Duis*, this is not a correct statement of the law. Pursuant to *Duis*, if a defendant is justified in using force toward an individual, the defendant is justified in

the force employed, which mistakenly strikes the actual victim. Thus, the self-defense instruction given to the jury in the instant case was legally incorrect, was prejudicial to Owens, and necessitates a reversal of his convictions and a remand of this cause for a new trial.

Although we have determined that Owens' convictions must be reversed and the cause remanded for a new trial, because Owens' remaining assignments of error are likely to recur during his retrial, we proceed to address those issues. See, *State v. Harney*, 237 Neb. 512, 466 N.W.2d 540 (1991); *State v. Engleman*, 5 Neb. App. 485, 492, 560 N.W.2d 851, 857 (1997) ("[I]f an issue is likely to recur upon remand, an appellate court may discuss it, even though it is not dispositive of the appeal").

### 3. ERRONEOUS EXCLUSION OF EVIDENCE

Owens' final assignment of error is that he was denied a fair trial because the trial court did not allow defense counsel to obtain testimony from Carey, his mother, regarding an alleged prior inconsistent statement by Jaderborg which he claims would have impeached Jaderborg's testimony. Additionally, Owens contends that the trial court erred in refusing defense counsel the opportunity to explore Owens' state of mind regarding his claim of self-defense and alternatives to his act of force.

It is within the trial court's discretion to admit or exclude evidence, and such rulings will be upheld on appeal absent an abuse of discretion. *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989); *State v. Blair*, 230 Neb. 775, 433 N.W.2d 518 (1988); *State v. Methe*, 228 Neb. 468, 422 N.W.2d 803 (1988).

### (a) Prior Inconsistent Statement

First, we address Owens' contention that the trial court erred by refusing to allow defense counsel to obtain testimony from Carey concerning a prior inconsistent statement allegedly made by Jaderborg for the purpose of impeaching Jaderborg.

During the State's case in chief, Jaderborg testified that Owens said to her, " 'I think I saw some glass break. I hope I shot someone.' " On cross-examination, defense counsel asked Jaderborg if she, in her statement to police, stated that Owens

said to her, "I hope I hit somebody." Jaderborg admitted that such a statement was not included in her statement to police.

Defense counsel attempted further impeachment of Jaderborg during the presentation of Owens' defense by calling Carey to the stand. The following colloquy took place during Carey's testimony:

> [DEFENSE COUNSEL:] Did [Jaderborg] tell you in any conversations that you had with her that [Owens] had ever said he hoped he had hit anybody when he shot the gun?
>
> [PROSECUTOR]: Objection, hearsay.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: This is offered to rebut the testimony of that witness.
>
> THE COURT: I sustained the objection.
>
> [DEFENSE COUNSEL]: Did she ever state whether or not [Owens] had told her he hoped he had hit somebody?
>
> [CAREY:] No.
>
> [PROSECUTOR]: Same objection, Your Honor.
>
> THE COURT: Sustained.

The State did not move to strike Carey's answer. An off-the-record discussion was then had between the court and counsel at the bench. The jury was sent to the jury room, and the following proceedings were held outside of the jury's presence:

> [DEFENSE COUNSEL]: Let the record show that the young lady, Jaderborg, has testified under oath that she has never been in my client's family's home subsequent to the shooting. I called the mother of [Owens] to impeach her, who has testified she has in fact been there every Tuesday and Thursday for purposes of communicating with [Owens] on the telephone, and since the young lady has said that [Owens] told her I hope I hit somebody when I fired the gun, it's permissible for me to bring this woman in to say she has talked to me many times and what she told me [Owens] said was I hope I didn't hit anybody when I fired the gun. I think I am impeaching her by this testimony. I don't know how else to impeach her. By calling somebody to whom she has made a totally contradictory statement, I think that's proper impeachment. She is

going to say that the girl told me that he said I hope I didn't hit somebody.

THE COURT: Mr. [Prosecutor]?

[PROSECUTOR]: My position is that information is hearsay within hearsay. I guess I don't have an argument with counsel, giving counsel a chance to impeach a witness, to do what he has to do for his client. He has done that with his line of questioning with this witness already. To get to the point who said what and bring in third parties after the fact is hearsay within hearsay.

THE COURT: Objection is sustained.

[DEFENSE COUNSEL]: If the witness were allowed to testify she would testify that the young woman told her [Owens] said that he hoped he hadn't hit anybody when he fired the gun.

THE COURT: Offer made and same objection?

[PROSECUTOR]: Yes.

THE COURT: Same ruling.

In his brief, Owens contends that the court should have allowed Carey to testify to Jaderborg's alleged prior inconsistent statement, "despite the constraints in the exception for prior inconsistent statements as set out in Nebraska Revised Statutes § 2[7]-801" because the statement went to Owens' intent and because the jury should have been allowed the opportunity to determine witness credibility. Brief for appellant at 11.

■ Neb. Evid. R. 801, Neb. Rev. Stat. § 27-801 (Reissue 1995), provides, in pertinent part:

(4) A statement is not hearsay if:

(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (i) inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . . .

Thus, "what was previously characterized as hearsay available for the purpose of impeachment only has now become substantive evidence of fact contained in the statement, provided the requirements prescribed by Rule 801(4)(a)(i) are satisfied." *State v. Johnson*, 220 Neb. 392, 397, 370 N.W.2d 136, 140 (1985), *abrogated on other grounds, State v. Morris*, 251 Neb.

23, 554 N.W.2d 627 (1996). Accord *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986).

In the instant case, the alleged prior inconsistent statement sought to be used by the defense to impeach Jaderborg's testimony was not given under oath or made in another proceeding or deposition. Therefore, the alleged prior inconsistent statement does not fall under the provisions of § 27-801(4)(a)(i). However, although not substantive evidence, if Jaderborg, as a witness in Owens' trial, had been impeached by her statements to Carey, Jaderborg's credibility and the weight to be given to her testimony would have been matters for evaluation and determination by the jury. See, *State v. Williams, supra*; *State v. Robertson*, 223 Neb. 825, 394 N.W.2d 635 (1986).

■ Neb. Evid. R. 613(2), Neb. Rev. Stat. § 27-613(2) (Reissue 1995), provides in pertinent part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require." The foundational requirement of § 27-613(2), that the witness be afforded an opportunity to explain or deny the alleged prior inconsistent statement, may be met either before or after the introduction of the extrinsic impeaching evidence. *State v. Johnson, supra*; *State v. Price*, 202 Neb. 308, 275 N.W.2d 82 (1979); *State v. Al-Zubaidy*, 5 Neb. App. 327, 559 N.W.2d 774 (1997), *rev'd on other grounds* 253 Neb. 357, 570 N.W.2d 713.

In *State v. Al-Zubaidy, supra*, during the State's case in chief, the witness testified that Al-Zubaidy came to the home, broke through the back door with a knife in his hand, began stabbing the first victim, and when the victim's daughter attempted to assist her mother, Al-Zubaidy stabbed her. During the second victim's testimony (State's witness), she also stated that she had moved to Michigan. On cross-examination, Al-Zubaidy did not confront the State's witness with the alleged prior inconsistent statement, and at the conclusion of the State's witness' testimony, Al-Zubaidy did not request that the State's witness remain subject to recall, nor did he in any way suggest to the State that there was a need for the State's witness to remain in

Nebraska to possibly explain or deny a prior inconsistent statement. The court dismissed the State's witness, and it is apparent from the dialog between the attorneys at the time of the proffered extrinsic testimony concerning the alleged prior inconsistent statement that the State's witness returned to Michigan after testifying.

During Al-Zubaidy's defense, he sought to present testimony from Al-Zubaidy's witness concerning the alleged prior inconsistent statement made by the now-absent State's witness. The district court refused to allow Al-Zubaidy to present the extrinsic evidence of the State's witness' alleged prior inconsistent statement. Al-Zubaidy appealed this ruling to the Nebraska Court of Appeals.

On appeal, the State argued that the State's witness became unavailable after testifying and, therefore, would not have had an opportunity to explain or deny the alleged prior inconsistent statement. Al-Zubaidy argued that the decision not to confront the State's witness with the alleged prior inconsistent statement during her testimony was a tactical decision and that Al-Zubaidy was never notified that the State's witness would become unavailable.

In finding that the district court did not err in refusing to allow Al-Zubaidy to present extrinsic evidence of the witness' alleged prior inconsistent statement, the Court of Appeals stated:

> On the facts of the present case, it is apparent that [the State's witness] would not have had an opportunity to explain or deny the alleged inconsistent prior statement had [Al-Zubaidy's witness] been allowed to testify. Appellant was aware that [the State's witness] was living in Michigan when she testified, and he did nothing to suggest to anyone that there was reason for her to remain in Nebraska after her testimony was finished. Because rule 613(2) requires that the party to be impeached be given an opportunity to explain or deny the inconsistent statement, and because such an opportunity would have been denied [the State's witness] in the present case, the district court did not err in refusing to allow the extrinsic evidence. Additionally, appellant has not demonstrated that the

interests of justice require dispensing with the foundational requirement of rule 613(2) in the present case. This assigned error is without merit.

5 Neb. App. at 339-40, 559 N.W.2d at 782.

In the instant case, although Owens had the opportunity to cross-examine Jaderborg regarding her alleged prior inconsistent statement to Carey, he did not do so. During Owens' defense, he then sought to introduce extrinsic evidence of Jaderborg's alleged prior inconsistent statement through Carey's testimony. However, the requirement in § 27-613 that a witness sought to be impeached by an alleged prior inconsistent statement must be afforded an opportunity to explain or deny the alleged prior inconsistent statement may be met either before *or after* the introduction of the extrinsic impeaching evidence. Therefore, Jaderborg could have been recalled after Carey's testimony to allow her the opportunity to explain or deny the alleged prior inconsistent statement. Unlike the witness in *State v. Al-Zubaidy, supra*, the evidence adduced was that at the time of Owens' trial, Jaderborg went to Burke High School and, thus, would have been available for Owens to recall to testify. Consequently, the district court abused its discretion by refusing to allow Owens to adduce the extrinsic testimony of Jaderborg's alleged prior inconsistent statement through Carey.

### (b) Exclusion of Owens' Testimony
### Regarding His State of Mind

Next, Owens contends that the district court erred in excluding testimony by Owens regarding alternatives to his act of force and his self-defense claim. The questions which Owens contends he should have been allowed to answer are as follows:

[DEFENSE COUNSEL:] Was there any other option that you had, that you were aware of, at the time you fired the gun?

[PROSECUTOR]: Objection, form of the question.

THE COURT: Sustained.

[DEFENSE COUNSEL:] Did you think you could do anything else other than what you did?

[PROSECUTOR]: Objection, form of the question.

THE COURT: Sustained.

Neb. Evid. R. 103, Neb. Rev. Stat. § 27-103 (Reissue 1995), provides that error may not be predicated upon a ruling excluding evidence unless a substantial right of the party is affected and unless "the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked." See, also, *State v. Cortis*, 237 Neb. 97, 465 N.W.2d 132 (1991); *State v. Eldred*, 5 Neb. App. 424, 559 N.W.2d 519 (1997).

In *State v. Fonville*, 197 Neb. 220, 248 N.W.2d 27 (1976), the Nebraska Supreme Court stated that § 27-103 does not appear to have changed the general rule previously applicable that where evidence is excluded, an offer of proof is generally a prerequisite to review on appeal. In *Fonville*, the court held that an offer of proof was necessary where it was not reasonably clear what information was sought to be elicited by the question and whether that information was material and competent.

In the instant case, no offer of proof was made by defense counsel and the substance of the evidence sought to be elicited was not apparent from the context within which the questions were asked. While one might reasonably speculate that Owens' answers to the proffered questions by defense counsel would be exculpatory and consistent with Owens' self-defense theory, we are not allowed to speculate as to such matters. See *State v. Eldred, supra* (because appellate court could only speculate on what evidence might have ultimately been from question asked, trial counsel failed to preserve alleged error for appellate review). Therefore, because we are unable to determine from the questions and the context thereof what evidence Owens' trial counsel was attempting to offer and whether it was competent without engaging in speculation, the claim of error cannot be sustained because there was no offer of proof to overcome these deficiencies.

## V. CONCLUSION

For the reasons set forth herein, Owens' convictions are reversed, and this cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.